Copies to: Judge
AUSA – Special Proceedings
Dft.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

*Accept for filing*
*Judge Walton*
*5/2/08*

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **Plaintiff,** | * | **Crim. No. 06-227** |
| **v.** | * | **Honorable Reggie B. Walton** |
| **JOHN DOWNS III,** | * | |
| **Defendant.** | * | |

FILED

MAY 0 2 2008

Clerk, U.S. District and
Bankruptcy Courts

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR NEW TRIAL

The Defendant, JOHN DOWNS III, *pro se*, pursuant to this Court's Order, dated February 22, 2008, files this Memorandum of Law in Support of Motion for New Trial. In support of this Memorandum, the Defendant states as follows:

### I. PROCEDURAL HISTORY

On July 27, 2006, the U.S. Attorney for the District of Columbia filed a multicount indictment in this matter. Count One of the indictment charges the defendant, John Downs III, and thirteen others: Darnell A. Jackson, Troy A. Hopkins, Tony F. Hilt, Tinesha Adams, Shawntae Anderson, Lawrence Bryant, Troy J. Chavios, Christopher M. Dobbins, Lanika M. Franklin, William H. Gray, Bernie Hargrove, John Doe a/k/a Keith Roots, and Dominique M. Washington with Conspiracy to Possess with Intent to Distribute and Distribution of One Kilogram or More of Phencyclidine, in violation of Title 21, U.S.C. 846, 841 (a)(1) and 841 (b)(1)(A)(iv).

On August 3, 2006, the defendant, John Downs III, was arrested at his sister's home in Columbia, Maryland. On this same date, after his arrest, Mr. Downs made several custodial statements, after the advisement of *Miranda* rights implicating himself as a small quantity PCP distributor in the Annapolis, Maryland area whose supplier was Darnell Jackson, the lead defendant in this matter.

James W. Rudasill, Jr. #318113, was appointed to represent Mr. Downs under the Criminal Justice Act, on or about August 3, 2006. Counsel represented Mr. Downs at his initial appearance/detention hearing, arraignment, numerous status hearings and at trial. Counsel filed pretrial motions.

Furthermore, counsel negotiated a plea with the government, on Mr. Downs's behalf, and personally participated in approximately ½ dozen debriefing meetings with Mr. Downs, Assistant U.S. Attorneys Elisa Poteat and Emery Cole, and a number of special agents assigned to the case. These negotiations were successful, to the extent that, at the conclusion of the motions hearings on September 24, 2007, government counsel placed on the record that if Mr. Downs would enter into the plea agreement on the eve of trial, he would still most likely qualify for a downward sentencing departure pu7rsuant to U.S.S.G. Sec. Sec. 5K1.1.

At trial, which began on September 25, 2007, appointed counsel called eleven witnesses at trial on behalf of Mr. Downs. Counsel's closing argument in this matter spanned more than ninety minutes over two days. Nonetheless, on November 27, 2007, the jury retuned a verdict of guilty as to Count One with respect to Mr. Downs and Troy Hopkins.

On December 4, 2007, Mr. Downs filed a Motion for New Trial. The grounds raised in the Motion for New Trial were:

1)    that during deliberations, one of the jurors reported to the trial court that he felt threatened. Without any curative measures taken by the court, the Defendant was denied his constitutional right to a fair trial,

2)    that the Defendant's conviction was a result of judicial misconduct, and

3)    that the Defendant was denied his constitutional right to effective assistance of trial counsel.

On February 20, 2008, after a hearing, the Court ordered that Mr. Downs present a Memorandum in support of his Motion for New Trial. In addition to the grounds set forth in the Motion for New Trial filed on December 4, 2007, Mr. Downs presents the following issues:

1)    that the evidence adduced at trial was insufficient to sustain his conviction for Conspiracy to Possess with Intent to Distribute and Distribution of One Kilogram Grams or More of Phencyclidine,

2)    that the trial court erred in allowing Defendant's statements provided to government during debriefing to be presented into evidence,

3)    that trial counsel labored under a conflict of interest, and

4)    multiple issues that trial counsel rendered ineffective assistance of counsel.

## II. STANDARD OF REVIEW

Rule 33 permits the district court to vacate judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33; *United States v. McBride*, 862 F.2d 1316, 1319 (8th Cir. 1988) (the interest of justice standard "requires the district court to balance the alleged errors against the record as a whole and evaluate the fairness of the trial."). However, Rule 33 divides motions for new trial based on the interest of justice into two different subcategories: (1) motions based on newly discovered evidence; and (2) motions based on "other grounds." The former may be brought within three years of the verdict or finding of guilt, while the later must be brought within seven days of the verdict or finding of guilt.

The trial court should not grant a motion for new trial unless there would be a miscarriage of justice or "the weight of the evidence preponderates against the verdict." *United States, v. O'Keefe*, 128 F.3d 885, 898 (5th Cir. 1997). A new trial is granted only upon demonstration of adverse effects on substantial rights of a defendant. *United States v. Rasco*, 123 F.3d 222, 228 (5th Cir. 1997).

Courts take a broad approach to the "in the interest of justice " standard. In *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 817-18 (1988), the Supreme Court held that, between dismissal for lack of jurisdiction and transfer, in a close case, the "interest of justice" dictate transfer – not dismissal – so that the court can reach the merits. *See United States v. Present*, 190 F.3d 279, 283 (4th Cir.1999) ("interest of justice" gives broad latitude in habeas corpus proceedings); *United States v. Hawkins*,

76 F.3d 545, 552 (4th Cir. 1996) (broad discretion to grant a new trial "in the interest of justice"). It is in the "interest of justice" for this Court to grant Mr. Downs's Motion for New Trial.

## III.  ARGUMENT IN SUPPORT OF ALLEGATIONS

### A.    Insufficient Evidence to Sustain Conviction for Conspiracy

The evidence presented at trial was not sufficient to support Mr. Downs's conviction for Conspiracy to Possess with Intent to Distribute and Distribution of One Kilogram or More Phencyclidine.

The reviewing court reviews a sufficiency of the evidence *de novo* and will reverse a conviction only if, after reviewing the evidence in the light most favorable to the jury's verdict and giving the government the benefit of all reasonable inferences that may be drawn from the evidence, no construction of evidence will support the jury's verdict. *United States v. Simon*, 376 F.3d 806, 808 (8th Cir. 2004). Either direct or circumstantial evidence mat provide a basis for conviction; adducing direct evidence at trial is not a requirement. *Id.*

"A conspiracy conviction requires a showing that a conspiracy existed (two or more persons joined together for the purpose of committing a criminal act) and that the charged party knew of and intended to join in the agreement." *United States v. Cavender*, 228 F.3d 792, 800 (7th Cir. 2000). A mere buyer-seller relationship is not enough to sustain a conspiracy conviction; rather there must be some evidence of jointly undertaken activity. *United States v. Adkins*, 274 F.3d 444 (7th Cir. 2001) (Buyer-seller relationship did not establish conspiracy) quoting, *United States v. Blankenship*, 970 F.3d 283, 285-86 (7th Cir. 1992); *United States v Espino*, 317 F.3d 788 (8th Cir. 2003) (Evidence of association or acquaintance, though relevant, is not enough by itself to establish a conspiracy); *United States v. Ceballos*, 340 F.3d 115 (2nd Cir. 2003) (knowledge of the existence and goals of a conspiracy does not of itself make one a coconspirator); United *States v. Bewig*, 354 F. 3d 731 (8th Cir. 2003) ( A would-be conspirator must in some sense promote the venture himself, make it his own, and have a stake in the outcome); *United States v. Silvestri*, 409 F. 3d 131 (11th Cir. 2005) ( Conviction for conspiracy to

launder money required proof that: (1) agreement existed between two or more persons to commit crime; and (2) defendant knowingly and voluntarily joined or participated in conspiracy).

In Mr. Downs's case, although the government presented evidence that co-defendants cooperated with each other over a period of time, and their dealings were standard, there was no evidence that Mr. Downs traveled with Jackson or others to purchase drugs for the conspiracy. There was no evidence that Mr. Downs brought or sold drugs as an agent of another alleged conspirator. Furthermore, in the light most favorable to the government, while the evidence did indicate that Mr. Downs purchased drugs from Jackson with intent to distribute, there was no evidence that Mr. Downs "knew of and intended to join in [an] agreement" with other conspirators to transport drugs from California. In fact, on October 15, 2007, almost two weeks into Mr. Downs's trial, the trial judge stated: "Nobody has really said anything about you that would be a justification you being found guilty...None of them, in my view, has said anything that would show that you were involved in drug activity." (October 15, 2007, A.M. Session T. 89-90). Moreover, while Mr. Downs may have incriminated himself (admitted that he purchased drugs from Jackson), there was no further evidence adduced after October 15th that would support a conspiracy conviction. Finally, Jackson's testimony regarding all telephone conversations between himself and Mr. Downs was based on Jackson's interpretation of these conversations and was not corroborated by further testimony (of course, a defendant cannot be convicted on the uncorroborated testimony of coconspirator).

In sum, the evidenced adduced at trial merely indicates a "buyer-seller relationship" between Mr. Downs and Jackson. Accordingly, because "the weight of the evidence preponderates against the verdict," "in the interest of justice," this Court should grant Mr. Downs's Motion for New Trial – a reversal of the conviction and vacating of the sentence and judgment in this case.

Relying on *Mosley v. State*, 378 Md. 458, 557 (2003), Mr. Downs further asserts that he was denied effective assistance of trial counsel when his counsel did not articulate insufficiency of the evidence as a basis for a motion for judgment of acquittal.

It should be noted that Mr. Downs's testimony, in which he incriminated himself, came after the State presented its case in chief and after counsel's motion for judgment of acquittal. Prior to Mr. Downs's self-incrimination, Mr. Downs's case was close because it was based on the uncorroborated testimony of co-defendant, Mr. Jackson – and that testimony was flawed by a number of inconsistencies.

Apart from Jackson's testimony the government presented essentially no evidence that was not reasonably explained by Mr. Downs's theory of the case. And apart from Jackson's and Mr. Downs's testimony, all other evidence either exonerated or failed to inculpate Mr. Downs regarding the conspiracy. As such, where the motion for judgment of acquittal was made but not particularized, one may never know for certain whether the trial judge might have entertained some doubt about the legal sufficiency of the evidence and been inclined to grant the motion in whole or in part. The trial judge was not given the opportunity to rule and, because the appellate court is not given the opportunity to rule.

## B.  Trial Counsel Labored Under a Conflict of Interest – Divided Loyalty Between Downs and Co-defendants.

Mr. Downs next asserts that he was deprived of his right to effective assistance of counsel where trial counsel labored under a conflict of interest – divided loyalties between Mr. Downs and co-defendants.

The Sixth Amendment to the United States Constitution, as a safeguard necessary to ensure fundamental human rights of life and liberty, guarantee to any criminal defendant the right to have the assistance of counsel. *Glasser v. United States*, 315 U.S. 60, 69 (1942); *Wood v. Georgia*, 450 U.S. 261, 271 (1981). A defense attorney's representation must be untrammeled and unimpaired, unrestrained by commitments to others; counsel's loyalty must be undivided, leaving counsel free from any conflict of interest. *Holloway v. Arkansas*, 435 U.S.475, 482 (1978); *Glasser*, 315 U.S. at 70. Nevertheless, a defendant may waive his right to conflict-free counsel, and, having made a knowing and intelligent waiver, may not later attack his conviction based on an asserted conflict. *United States v. Lowry*, 971 F.3d 55 (7th Cir. 1992). A waiver is "knowing and intelligent" if it is "made with sufficient awareness of relevant circumstances and likely

consequences." *Id.* The key question is whether the defendant knew enough to "make the choice an informed one – a rational reconciliation of risks and gains that are in the main understood." *Id.* at 61.

The Sixth Amendment right to effective assistance of counsel in the conflict-free sense has been addressed by the Supreme Court in three significant cases, which have resulted in two divergent approaches. *Cuyler v. Sullivan*, 446 U.S. 335 (1980); *Holloway*; *Glasser*.

In *Cuyler*, the potential conflict of interest was not brought to the trial court's attention. Three co-defendants were jointly represented by two attorneys. Sullivan did not object to the multiple representation until after he was convicted and moved for post-conviction relief on the grounds that he was denied effective assistance of counsel. In establishing a standard to be applied to cases in which the potential conflict is not brought to the trial court's attention, the Supreme Court held that "[I]n order to establish a violation of the Sixth Amendment, a defendant *who raised no objection at trial* must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." 446 U.S. at 348 (emphasis added). In this context, "the possibility of conflict is insufficient to impugn a criminal conviction." *Id.* at 350 Commenting on *Glasser*, the Court held:

> *Glasser* established that unconstitutional multiple representation is never harmless error. Once the Court concluded that Glasser's lawyer had an actual conflict of interest, it refused to 'indulge in nice calculations as to the amount of prejudice' attributable to the conflict. The conflict itself demonstrated a denial of the 'right to have the effective assistance of counsel.' 315 U.S., at 76. Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate claim of ineffective assistance.

*Id.* at 349-50. Contrary to the resolution in *Holloway*, Sullivan, who did not object before trial, was required to show that an actual conflict of interest adversely affected his lawyer's performance.

7

To date, the Supreme Court has never squarely resolved the question of whether proof of an adverse effect of a conflict of interest is required to reverse a conviction. *See e.g., Bonin v. California*, 494 U.S. 1039, 1043 (1990) (Marshall, J., dissenting). Numerous cases in other jurisdictions addressing conflict of interest conclude, however, that the time at which a conflict of interest, or a potential one, is raised and is brought to the court's attention governs how this issue is to be treated. *See, e.g., Selsor v. Kaiser*, 22 F.3d 1029, 1032 (10th Cir. 1994); *United States v. Fish*, 34 F.3d 488, 492 (7th Cir. 1994); *Hamilton v. Ford*, 969 F.2d 1006,1011 (11th Cir. 1992); *People v. Burchette*, 628 N.E. 2d 1014, 1023 (Ill. App. Ct. 1994); *State v. Wille*, 595 So. 2d 1149, 1153 (La. Ct. App. 1997); *State v. Dillman*, 591 N.E. 2d 849, 852 n.1 (Ohio Ct. App. 1990). These cases reason that when a possible conflict exists, but the trial court is not advised of the conflict in a timely manner, the *Cuyler* standard applies. In order to establish a violation of the Sixth Amendment right to effective assistance of counsel, the defendant must show that an actual conflict of interest adversely affected his lawyer's performance. On the other hand, when the defendant advises the trial court of the possibility of a conflict of interest, the *Glasser/Holloway* standard applies. "[A] court confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant separate counsel." *Wheat v. United States*, 486 U.S. 153, 160 (1988). The trial court is required to "either appoint separate counsel, or to take adequate steps to ascertain whether the risk was too remote to warrant separate counsel." *Holloway*, 435 U.S. at 484. If the trial court fails to take "adequate steps" or improperly requires joint or dual representation, then reversal is automatic, without a showing of prejudice, or adverse effect upon representation. In the instant matter, both *Cuyler* and *Glasser/Holloway* line of reasoning are applicable because the trial court was confronted with and inquired into the actual conflict and, Mr. Downs allegedly waived his constitutional right to conflict-free representation.

In support of his claim, Mr. Downs first directs the Court's attention to trial counsel's cross-examination and the trial court's responses regarding government witness, Tanisha Adams, which, in pertinent part, is as follows:

8

THE COURT:  I GUESS YOU CAN DO WHAT YOU WANT TO, BUT IT'S A LITTLE PERPLEXING AS TO WHY YOU WOULD SEEK TO IMPUGN HER INTEGRITY WHEN SHE HASN'T PUT A GLOVE ON YOUR CLIENT … IT'S KIND OF WEIRD, I THINK, IF SOMEBODY HASN'T HURT YOU, TO TRY AND HURT THEIR CREDIBILITY.

MR. RUDASILL:   I AM NOT TRYING TO HURT HER CREDIBILITY.

THE COURT:   WELL, YOU ARE. I MEAN YOU ARE ATTACKING HER CREDIBILITY BY BRINGING OUT BIAS THAT SHE MAY HAVE AND SO FORTH, BUT SHE HASN'T SAID ANYTHING TO HURT YOUR CLIENT. I MEAN I GUESS YOU CAN, BUT IT'S KIND OF ODD.

OKAY. IT'S YOUR PREROGATIVE, BUT I JUST WANT TO RAISE IT BECAUSE IT SEEMS KIND OF STRANGE. I HAVE JUST NEVER SEE, IF A PERSON HASN'T BEEN HURT BY A WITNESS, WHY A LAWYER WOULD WANT TO IMPUGN HER INTEGRITY AS IT RELATES TO THAT PARTICULAR LAWYER'S CLIENT. BUT BE THAT AS IT MAY.

MR. RUDASILL:   YOUR HONOR, WHAT I WANT TO PUT ON THE RECORD AT THIS POINT IS I HAVE DISCUSSED THIS WITH CO-COUNSEL, AND THE COUNSEL BEHIND ME IN THE ORDER OF EXAMINATION HAVE MADE CERTAIN REQUESTS THAT I DO A COMPREHENSIVE EXPLORATION OF THESE BIAS ISSUES. CLEARLY, SHE HAS NOT HURT MY CLIENT. I CAN SIT DOWN; I CAN LET THEM DO THE EXAMINATION.

> THE COURT:    ... IF IT WAS MY CLIENT, I WOULD BE
> SAYING NOTHING. I WOULD BE HIDING OVER THERE SINCE
> SHE HASN'T SAID ANYTHING ABOUT MY CLIENT. I WOULDN'T
> BE STANDING UP HERE. BUT I GUESS IF YOU ALL THINK THAT
> THAT'S GOOD STRATEGY, I GUESS YOU CAN PURUE IT THAT
> WAY. OKAY.

(October 9, 2007, A.M. Session, T. 18-19) (emphasis in original).

Mr. Downs next directs the Court's attention to trial counsel's cross-examination and the trial court's responses regarding government witness Deputy John Cater, which, in pertinent part, is as follows:

> THE COURT:    YOU ARE GOING TO BE OPENING UP A
> CAN OF WORMS FOR MR. HOPKINS. AND I DON'T SEE HOW
> THIS HELPS YOU. I MEAN, I GUESS I'M A LITTLE PERPLEXED
> AS TO WHY YOU KEEP STANDING UP HERE AND TALKING
> BECAUSE IT SEEMS LIKE – YOU KNOW, THAT OLD SAYING
> OUT OF SHAKESPEARE: THOU DOST PROTEST TOO MUCH.
>
> AND IF SOMEBODY HASN'T SAID ANYTHING THAT'S
> HURTING YOUR CLIENT – I JUST DON'T UNDERSTAND WHY
> YOU ARE UP THERE QUERYING HIM IN REFERENCE TO THIS
> BECAUSE THIS DOESN'T EVEN RELATE TO YOUR CLIENT. THIS
> EVIDENCE, AS I UNDERSTAND, IS ONLY COMING IN IN
> REFERENCE TO MR. HOPKINS.
>
> MR. RUDASILL: I UNDERSTAND, YOUR HONOR, BUT
> THIS IS A CONSPIRACY.
>
> THE COURT:  I UNDERSTAND, BUT THIS EVIDENCE ISN'T
> OF THE CONSPIRACY AS IT RELATES TO YOUR CLIENT. IT
> ONLY RELATES TO MR. HOPKINS.

(October 9, 2007, A.M. Session, T. 122-23) (emphasis in original).

Mr. Downs further directs the Court's attention to trial counsel's cross-examination and the trial court's responses regarding government witness Troy Chavious, which, in pertinent part, is as follows:

THE COURT:    I MEAN, AGAIN, COUNSEL ... I AM A LITTLE PERPLEXED AS TO WHY YOU WANT TO THAT. HE HASN'T HURT YOUR CLIENT. HE HASN'T SAID YOUR CLIENT5 HAD ANYTHING TO DO WITH DRUGS ....

SO I DON'T KNOW WHY YOU ARE TRYING TO IMPUGN HIS INTEGRITY. IF ANYTHING, IT SEEMS TO ME YOU WOULD WANT TO PUMP HIM UP AND MAKE HIM SEEM LIKE HE IS A VERY HONORABLE PERSON BECAUSE HE SAYS YOUR CLIENT DOESN'T DO ANYTHING. NOW YOU WANT TO TEAR HIM DOWN. I DON'T UNDERSTAND THAT – I DON'T UNDERSTAND THAT TACTIC.

MR. RUDASILL:    HE IS A GOVRNMENT WIRNESS IN A CONSPIRACY CASE –

THE COURT:    I UNDERSTAND, BUT HE HASN'T HURT YOUR CLIENT ... MAYBE THE RULES OF HOW THIS GAME IS PLAYED HAVE CHANGED, BUT I ALWAYS THOUGHT THAT, YOU KNOW, AS A LAWYER, IF YOU WEREN'T BEING HURT BY SOMEONE, YOU DIDN'T, YOU KNOW, TAKE THEM ON IN REFERENCE TO THEIR CREDIBILITY. I MEAN JUST BECAUSE YOUR CLIENT IS PART OF A CONSPIRACY – HE IS NOT SAYING YOUR CLIENT HAD ANYTHING TO DO WITH THIS.

.

.

.

MR. RUDASILL:    YOUR HONOR, THE GOVERNMENT IS PROCEEDING ON THE THEORY THAT MR. HOPKINS IS A CORRUPTING INFLUENCE IN THIS YOUNG MAN'S LIFE ....

THE COURT:   AND HE SHOULD BE TRYING TO EXPLOIT THAT. I UNDERSTAND. I JUST DON'T UNDERSTAND WHY YOU ARE TAKING IT ON BECAUSE, I TELL YOU, IT SEEMS TO ME -- IF I WAS SITTING THERE AND I WAS THAT JURY, I WOULD BE SAYING TO MYSELF,"NOW, THIS MAN HASN'T SAID ANYTHING TO HURT THAT LAWYER'S CLIENT. AND IF HE HASN'T SAID ANYTHING TO HURT THAT LAWYER'S CLIENT, WHY IS HE TRYING TO ATTACK THIS GUY OTHER THAN HE MUST THINK THAT MAYBE HE DID HURT HIM"?

MR. RUDASILL:   ... THE ONLY POINT THAT I RAISE WITH THE COURT IS THAT MY EXPERIENCE IN THIS COURT IN THE LAST TWO CONSPIRACY CASES IN WHICH MY CLIENT PREVAILED ON COUNT 1 HAS BEEN TO ATTACK AND CHALLENGE THE GOVERNMENT'S THEORY ... AND EVERY GOVERNMENT WITNESS ... THAT IS OUR ZEALOUS RESPONSIBILITY ....

THE COURT:    WELL, I HAVE TRIED A LOT OF CONSPIRACY CASES, AND I HAVEN'T, I GUESS, SEEN THAT TACTIC EMPLOYED. AND I SURE DON'T SEE OTHER COUNSEL TAKING THAT SAME TACTIC. AND IT SEEMS TO ME THEY ARE BASICALLY IN THE SAME SITUATION THAT YOU ARE IN. THEY ARE NOT BEING HURT; THEREFORE, THEY DON'T, I ASSUME, SEEM TO FEEL THE NEED, YOU KNOW, TO TAKE ON THE TACTIOC THAT YOU ARE, BUT BE THAT AS IT MAY .. YOU HAVE A RIGHT, I GUESS, TO TAKE HIM ON IF YOU WANT TO. EVEN THOUGH HE IS MOT HURTING YOUR CLIENT – AND MAYBE GIVE LIFE TO HIS TESTIMONY REGARDING YOUR CLIENT WHERE OTHERWISE IT DOESN'T. I GUESS YOU HAVE A RIGHT TO DO THAT.

THE COURT:    MAYBE THERE IS A THEORY AMONG DEFENSE LAWYERS NOW THAT EVEN THOUGH A WITNESS MAY NOT BE HURTING YOUR CLIENT, THAT IN A CONSPIRACY CASE, YOU, NONETHELESS, HAVE TO TRY AND IMPUGN HIS INTEGRITY AND CREDIBILITY.

THE COURT:    ... AND I DO FIND IT PERPLEXING BECAUSE I THINK THAT, LIKE I SAID, IF A WITNESS ISN'T HURTING YOU, BUT YET YOU ARE STILL TRYING TO ATTACK HIM, THAT THE PERCEPTION THEN BECOMES THAT HE MUST BE HURTING YOU, EVEN TOUGH IT, YOU KNOW, ON ITS FACE, DOESN'T APPEAR TO BE THE CASE....

MR. RUDASILL:    YOUR HONOR, I WAS TRYING TO AVOID MAKING THIS REPRESENTATION, BUT I THINK AT THIS POINT, TO EXPLAIN MY BEHAVIOR, I NEED TO MAKE THIS RECORD. MR. HOPKINS HAS DIRECTLY REQUSTED MY ASSISTANCE IN HIS DEFENSE IN THIS MATTER.

THE COURT:  MR. HOPKINS?

MR. RUDASILL:   MR. HOPKINS. MR. TROY HOPKINS HAS REQUESTED THAT I ASSIST –

THE COURT:  ISN'T THAT A CONFLICT?

MS. POTEAT:  YES. IT IS.

THE COURT:   I THINK – HOLD ON. WE NEED TO TAKE A BREAK.

(October 15, 2007, A.M. Session, T. 56-68) (emphasis in original).

In the instant case, the trial court conducted an inquiry regarding Mr. Downs's right to conflict-free representation and his decision to waive said right. In the words of the trial court, it was determined that, although the government's witnesses were not

"hurting [Mr. Downs]," despite the court's repeated admonitions, trial counsel continued to try to impeach the witnesses, because, according to counsel, "Mr. Hopkins has directly requested my assistance in this area" explaining that there was an "informal joint defense agreement that has been articulated by Mr. Rudasill." Notwithstanding, Mr. Downs chose to proceed with counsel, stating that he felt "comfortable" and that he was receiving "quality representation." Following the inquiry, Assistant U.S. Attorney, S. Elisa Poteat, reiterated her concerns in regards to the conflict, aptly noting, " For him [Mr. Rudasill] to turn around now, after he has discredited witnesses who say his client didn't do anything – this is awfully late. I would ask the court to at least provide Mr. Downs with counsel who can advise him without there being any conflict, because it appears to the government that he has a conflict at least for one other witness in this case …. And, also, I would say that no disclosure – just for the record, no disclosure has been made to the government of this fact at all at any time. Nothing was said to us about it. The only time Mr. Rudasill said anything to me was he claimed that [Troy Hopkins's] family had called him and sought to retain him, and that it had not come to fruition. He told them ha had a conflict. And this was more than six months ago …. my biggest concern … is that Mr. Downs is acquiescing to this apparent conflict … that Mr. Rudasill … should not take advantage of this with a young man of this age. I have some concerns about that your honor …. For all the reasons that the Court stated much better than I can at this point at the bench about the appearance that that creates for people like Mr. Downs who – I think in fairness to Mr. Downs and Mr. Hargrove and the like, not at all similarly situated in this conspiracy than Mr. Hopkins. They are very small potatoes compared to him, and they are not as culpable even if found guilty of amounts even coming close to him; and their exposure obviously should be, even after any conviction in this case should that occur, should be considerably less …. " (October 15, 2007, A.M. Session, T. 68 – October 15, 2007, P.M. Session, T. 10) (emphasis in original).

In this case, as demonstrated by the record, trial counsel actively represented conflicting interests and the actual conflict of interest adversely affected his defense. While the risks of trial counsel advocating for co-defendants, in particular, Mr. Hopkins, was inherent, there was nothing to be gained by the defense. As noted by the trial court, counsel's representation was "perplexing." The trial court further found counsel's

14

representation to be "astounding," opining that the court found it "inconceivable that a defense lawyer at a joint trial would feel some type of obligation to do things on behalf of a co-defendant." Nevertheless, after almost two weeks of trial testimony, in the eyes of the court, no evidence had been presented "that would be a justification for [Mr. Downs] being found guilty." However, as noted by the trial court, trial counsel's continued, ill-advised, cross-examination of government witnesses, gave the jury the "perception" that the witnesses were hurting the defense. Against this background, and, in light of the fact that Mr. Downs's codefendants, Bernie Hargrove and Lawrence Bryant, whose trial counsel did not labor under a conflict of interest and against whom the government presented a plethora of evidence, were both acquitted, it can reasonably be concluded that trial counsel's laboring under a conflict of interest caused the rendition of the guilty verdict in this case.

Mr. Downs further argues that, the trial court erred, as a matter of law, when it determined that Mr. Downs waived his constitutional right to conflict-free representation. Although the trial court was confronted with and inquired into the actual conflict, the court failed to take "adequate steps" – failed to conduct a sufficient inquiry to ensure that Mr. Downs knowingly and intelligently waived his Sixth Amendment right to the assistance of counsel free from conflict of interest. Thus, the trial court failed to create an adequate record to support its finding that Mr. Downs knowingly and intelligently waived his constitutional right to conflict-free representation. The record displays nothing even remotely approaching the requisite concern and understanding of Mr. Downs's Sixth Amendment right to counsel – self-representation. The record falls short of ensuring that Mr. Downs knowingly and intelligently understood the consequences of each critical decision that he made.

Finally, at this point in the proceedings, and relying on *Michigan v. Jackson*, 475 U.S. 625 (1986), Mr. Downs asserts that the government bears the burden of establishing a valid waiver of his Sixth Amendment right to counsel free from conflict of interest.

A waiver of the constitutional right to conflict-free representation is "knowing and intelligent" if it is "made with sufficient awareness of relevant circumstances and likely consequences." The key question is whether the defendant knew enough to "make the choice an informed one – a rational reconciliation of risks and gains that are in the

main understood." During his redirect-examination of Mr. Downs, trial counsel informed the court that, Mr. Downs is "not criminally sophisticated," having "not been previously arrested." (November 5, 2007, P.M. Session, T. 15). As such, where the trial court failed to conduct an in-depth inquiry regarding Mr. Downs's waiver of his right to conflict-free representation and failed to advise Mr. Downs of his constitutional right to proceed *pro se*, Mr. Downs's waiver of his Sixth Amendment right to conflict-free representation was not a "knowing and intelligent" one. Because the trial court failed to take "adequate steps," to ensure that Mr. Downs knowingly and intelligently waived his constitutional right to conflict-free representation, reversal of Mr. Downs's conviction is automatic, without a showing of prejudice, or adverse effect upon the representation.

## C.  The Trial Court Erred in Allowing Downs Statements Provided to Government During Debriefing to be Presented Into Evidence.

Citing *United States v. Mezzanatto*, 513 U.S. 196 (1995) ("An agreement to waive the plea-statement Rules' exclusionary provisions is valid and enforceable absent some affirmative indication that the defendant entered the agreement unknowingly or involuntarily."), Mr. Downs now argues that the agreement during the government's debriefings that any statements that he made during plea discussions could be used against him for impeachment purposes was unenforceable under Federal Rule of Evidence 410 and Fed. Crim. P. 11(e) (6) (Rules or plea-statement Rules), which exclude from admission into evidence against a criminal defendant statements made during plea-bargaining.

The trial transcript in the instant matter, demonstrates an "affirmative indication" that any agreement entered into by Mr. Downs was neither knowingly nor voluntarily, but was the result of trial counsel's misapprehension regarding the terms of the agreement. In the event the Court does not find the statements were based on ineffective assistance of counsel, the Court must accept trial counsel's argument, "… to impeach my client's witnesses with their testimony – with my client's statement, runs totally affront to the Rules of Evidence and to Rule 10," and attribute the error to the trial court. If trial counsel was correct in his argument, the trial court should not have admitted Mr. Downs's statements into evidence.

16

This issue will be fully detailed under Mr. Downs's claim, *infra*, that he was denied effective assistance of trial counsel.

**D.    Trial Counsel Rendered Ineffective Assistance of Counsel.**

The Sixth Amendment, made applicable to the states through the Due Process Clause of the Fourteenth Amendment, guarantees the right to effective assistance of trial counsel. The seminal case defining the standard of whether an attorney's conduct has violated a defendant's Sixth Amendment right is *Strickland v. Washington*, 466 U.S. 668 (1984).

Under *Strickland*, ineffective assistance of counsel requires a two-step analysis. To establish ineffective assistance of counsel, Petitioner must demonstrate (1) that under the "performance prong," counsel's performance was deficient, i.e., counsel committed serious attorney error, and (2) that, under the "prejudice prong," counsel's deficient performance prejudiced the defense.

To meet the requirements under the "performance prong" and demonstrate "serious attorney error," Petitioner must show that the acts or omissions of counsel were the result of unreasonable professional judgment and that counsel's performance "fell below an objective standard of reasonableness" as determined by the prevailing professional norms. *Peterson v. State*, 158 Md. App. 558, 583(2004) (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003), and relying on *Mosley v. State*, 378 Md. 458, 557 (2003)). It is to be presumed that counsel's conduct was reasonable and the court's function is not to second-guess or evaluate the attorney's conduct with hindsight. *See Peterson*, 158 Md. App. at 583-84 (relying on *Evans v. State*, 151 Md. App. 365, 373 (2003), which, in turn, relied on *Strickland*, 466 U.S. at 689). The court must presume that counsel's performance was professionally competent and that it "derived not from error but from trial strategy." *Peterson*, 158 Md. App. at 584 (quoting *Mosley*, 378 Md. at 558). Strategic choices must be reasonable; however, the Court of Special Appeals stated:

> [S]trategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable only to

the extent that reasonable professional judgments support the limitations
on investigations. In other words, counsel has a duty to make reasonable
investigations or to make a reasonable decision that makes particular
investigations unnecessary. In any ineffectiveness case, a particular
decision not to investigate must be directly assessed for reasonableness in
all circumstances, applying a heavy measure of deference to counsel's
judgments.

*Peterson*, 158 Md. App. at 690-91.

So as not to not to "restrict the wide latitude counsel must have in making decisions," *Strickland* did not provide an all-inclusive list of imperatives for defense attorneys, but it did list the minimum duties that are required of counsel – duty of loyalty, a duty to advocate, a duty to consult with the accused in important decisions, a duty to keep the defendant informed of important developments, a duty to conduct a reasonable investigation into the facts and law, and a duty to possess and execute enough skill and knowledge to ensure a fair trial. *Id.* at 688-90. Even isolated errors may be sufficient, by themselves, to satisfy the performance prong. *Murray v. Carrier*, 477 U.S. 478, 495 (1986).

To meet the requirement under the "prejudice prong," Petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Peterson*, 158 Md. App. at 584 (quoting *Strickland*, 466 U.S. at 694). The Supreme Court has also stated, "[I] assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. In *Bowers v. State*, 320 Md. 416 (1990), the Court of Appeals for Maryland further interpreted the reasonable probability standard. The Court stated that *Strickland's* prejudice prong is met if it is shown that there may well have been a different result but for counsel's deficient performance. *Id.* at 427.

In *Bowers*, the Court of Appeals recognized the issue of the "cumulative effect" of trial counsel's errors. The Court stated: "It is necessary to look at the trial as a whole... Even when individual errors may not be sufficient to cross the threshold, the cumulative

effect may be." 320 Md. at 436. In *Cirincione v. State*, 119 Md.App. 471 (1998), the Court provided an in-depth analysis of "cumulative effect," stating:

> Even when no single aspect of the representation falls below the minimum standard required under the Sixth Amendment, the cumulative effect of counsel's entire performance may still result in a denial of effective assistance. [T]his cumulative effect may be applied to either prong of the *Strickland* test. That is, numerous non-deficient errors may cumulatively cause prejudice. As ever, the touchstone is whether, in view of all the circumstances, our confidence has been undermined by counsel's failing.

*Id.* at 506.

The "cumulative effect" inquiry requires an analysis of all deficiencies – "deficient errors" and "non-deficient errors." When considering the potential prejudice suffered by a defendant due to trial counsel's errors - both "deficient errors" and "non-deficient errors" – the focus is on the "totality of the evidence presented before the judge or jury." *Schmitt v. State*, 140 Md. App. 1, 18-20 (2000). In *Schmitt*, the Court stated that "some errors will have a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have an isolated effect."

In the present case, perhaps the most egregious serious attorney regarding trial counsel's ineffectiveness was his misapprehension – erroneous advice, concerning the government's use of Mr. Downs's statements made in 302 forms during debriefing. When the issue arose during trial, the following, in pertinent part, transpired:

> MS. POTEAT:    JUDGE WALTON, WE CAME IN TODAY TO RECEIVE INFORMATION FROM MR. RUDASILL. JUST AS WE HAD FEARED AND EXPRESSED OUR CONCERN TO THE COURT, MR. DOWNS IS NOT NOW GOING TO TESTIFY. AFTER CALLING CHARACTER WITNESSES TO SAY HE WAS VERY GOOD YOUNG MAN ... - - PROFERRING AT THE BENCH NO FEWER TAN EIGHT OCCASIONS, BY MY COUNT, THAT HIS CLIENT WAS GOING TO TESTIFY, HE IS NOW NOT GOING TO TESTIFY.
>
> AND WE ASK THE COURT TO DO TWO THINGS. THE FIRST IS THE COURT HAS ALREADY MADE A RULING THAT HIS

STAEMENTS – THIS IA A CONTRARY DEFENSE TO WHAT HE
PRESENTED IN THE DEBRIEFING. OBVIOUSLY, WE JUST WANT
THE COURT'S BLESSINGTO PUT ON LIMITED EVIDENCE THAT
HE WAS NOT A LAW-ABIDING PERSON IN COLLEGE. THIS
EVIDENCE WENT TO MIDDLE SCHOO;.

AND, TWO, WE ASK FOR A VERY SHARPELY WORDED
INSTRUCTION TO GO TO THE JURY ON THIS.

MR. RUDASILL:   YOUR HONOR, MY ASSERTIONS TO THE
COURT WERE MADE IN GOOD FAITH BASED ON ALL MY
CONVERSATIONS WITH MY CLIENT UP TO THAT TIME. IT
WASN'T UNTIL YESTERDAY, AFTER DISCUSSIONS WITH HIM
AND DISCUSSIONS WITH HIS FAMILY MEMBERS, THAT HE
ANNOUNCED TO ME THAT HE WAS ELECTING NOT TO
TESTIFY. THAT IS THE FIRST TIME SINCE I HAVE BEEN
REPRESENTING MR. DOWNS SINCE AUGUST 3RD, 2006, THAT HE
INDICATED THAT HE WOULD NOT BE A WITNESS ON HIS OWN
BEHALF, OR ANY KIND OF RESERVATIONS ABOUT THAT.

WITH REGARD TO THE GOVERNMENT'S CLAIM THAT
MR. DOWNS HAS OPENED THE DOOR TO IMPEACHMENT, I
HAVE REVIEWED HIS STATEMENT. HIS STATEMENT MAKES
NO CLAIM WITH RESPECT TO – THE 302 MAKES NO
REFERENCES TO SELLING DRUGS IN COLLEGE OR TAKING
DRUGS TO COLLEGE.

WHAT THE 302 RECORDED ON SEPTEMBER 22ND, 2006, WAS THAT MR. DOWNS STATED THAT ANOTHER SOURCE OF SUPPLY FOR DOWNS IS AN INDIVIDUAL – AND THIS IS NOT HIS STATEMENT. THIS IS THE AGENT'S SUMMARY OF WHAT WAS SAID....

YOUR HONOR, WITH RESPECT TO THE GOVERNMENT'S CLAIM THAT THEY HAVE THE RIGHT, UNDER ANY DEBRIEFING AGREEMENT, TO IMPEACH MY CLIENT'S CHARACTER WITNESSES WITH THEIR TESTIMONY – WITH MY CLIENT'S STATEMENTS RUNS TOTALLY AS AN AFRONT TO THE RULES OF EVIDENCE AND TO RIULE 410. THAT RULE APPLIES TO THE DEFENDANT TAKING THE STAND AND AFFIRMATIVELY ASSERTING SOMETHING DIFFERENT, AND NOT HIS WITNESSES. AND IF HE DOES NOT TESTIFY, THERE IS NO BASIS FOR THE COURT TO ADMIT THIS ASSERTED REBUTTAL EVIDENCE IT IS NOT REBUTTAL AS TO ANY STATEMENT MR. DOWNS MADE.

MR. DOWNS HAS ELECTED, AS HIS CONSTITUTIONAL RIGHT UNDER THE SIXTH AMENDMENT, NOT TO TESTIFY. THE COURT MUST AT SOME POINT GIVE AN INSTRUCTIOON TO THE JURYTHAT THEY CAN TAKE NO INFERENCE OF GUILT FROM THE DEFENDANT'S ELECTION NOT TO TESTIFY....

IT'S  A  BURDEN-SHIFTING  ARGUMENT  THE GOVERNMENT MAKES TO THE COURT.

MS. POTEAT:  YOUR HONOR, LAST WEEK MR. RUDASILL AGREED ON THE RECORD THAT WE WOULD BE ENTITLED TO

BRING THIS IN. SO THAT'S THE FIRST THING. THE SECOND
THING IS THAT –

     MR. RUDASILL:  IF MY CLIENT TESTIFIED.

     THE COURT:  ONE AT A TIME.

     .

     .

     .

     MR. RUDASILL:  THAT WAS MY AGREEMENT.

     MS. POTEAT:   AND HE SAID EIGHT TIMES HIS CLIENT
WAS  GOING  TO  TESTIFY.  NOT  JUST  RECENTLY,  BUT
THROUGHOUT THIS TRIAL.

     .

     .

     .

     THE COURT:  WELL, I AM CONSTANTLY TROUBLED BY,
UNFORTUNATELY, REPRESENTATIONS THAT SOME LAWYERS
WILL MAKE. AND SOMETIMES I HAVE TO QUESTION WHETHER
THEY ARE BEING TRUTHFUL....

     SO IT'S HARD FOR ME TO REACH A CONCLUSION THAT
A LAWYER HAS STOOD BEFORE THE COURT AS AN OFFICER
OF THE COURT AND LIED UNLESS I HAVE, YOU KNOW, VERY
STRONG EVIDENCE THAT WOULD INDICATE OTHERWISE. THE
REALITY IN REFERENCE TO THE DEFENSE OF DEFENDANTS IS
THAT  THEY  DO  HAVE  A  RIGHT  TO  MAKE  THEIR  OWN
ASSESMENT AS TO WHEN THEY ARE GOING TO TESTIFY. AND,
YOU KNOW, I COULD HAVE, I GUESS, REQUIRED THAT HE
MAKE THAT DETERMINATION – THAT HE TESTIFY FIRST, I
GUESS. I DON'T KNOW WHETHER I COULD DO THAT OR NOT. I
KNOW  THERE  ARE  SOME  CASES  THAT  SAY  THAT  A
DEFENDANT HAS A RIGHT TO MAKE HIS ASSESMENT AS TO

WHEN HE IS GOING TO TESTIFY IN THE PRESENTATION OF HIS DEFENSE.

SO IT MIGHT BE PROBLEMATIC FOR THE COURT TO FORCE THE DEFENDANT TO TESTIFY BEFORE HE DECIDES WHETHER HE IS GOING TO PRESENT CHARACTER TESTIMONY BECAUSE, OBVIOUSLY, A TESTIMONY – WHICH THE INSTRUCTION ITSELF SAYS, IN AND OF ITSELF, IS SUFFICIENT FOR A JURY TO FIND A DEFENDANT NOT GUILTY – COULD DECIDE THAT THE CHARACTER TESTIMONY, AFTER LISTENING TO IT, WAS SO CONVINCING THAT HE HAS MADE A DECISION AFTER THE FACT THAT HE NOT BR REQUIRED  -- THAT HE NOT HAVE TO TESTIFY.

I MEAN OBVIOUSLY, THERE WERE SOME VERY STRONG STATEMENTS MADE BY MR. RUDASILL. MR. RUDASILL SAID HE HAD TALKED TO HIS CLIENT AND THAT HE HAD CONCLUDED, IN CONSULTATION WITH HIS CLIENT, THAT THE ONLY WAY HE COULD BEAT THESE CHARGES IS IF HE TSETIFIED.

SO, I MEAN, THAT'S A VERY STRONG STATEMENT THAT'S MADE. SO I DON'T KNOW. IT'S BEING INDICATED THAT, YOU KNOW, AGREEING THAT, YOU KNOW, THE EVIDENCE IS SUFFICIENT FOR HIM TO BE CONVICTED.

BUT, YOU KNOW, IT'S ALWAYS VERY TROUBLING, AS I SAY, WHEN LAWYERS MAKE REPRESENTATIONS AND THOSE REPRESENTATIONS DON'T COME TO FRUITION, BUT IT' ALWAYS VERY DIFFICULT, AS I SAY, FOR THE COURT TO MAKE A DETERMINATION THAT THOSE STATEMENTS WERE MADE FALSELY.

IN REFERENCE TO WHAT THE GOVERNMENT IS SEEKING TO TRY TO BRING OUT, IT MAY NOT – AND I GUESS I NEED TO KNOW, WHAT WAS THE AGREEMENT IN REFERENCE TO THESE

STATEMENTS AND THE CIRCUMSTANCES UNDER WHICH THE
GOVERNMENT WOULD BE ABLE TO USE THEM?

MR. RUDASILL: *YOUR HONOR, MY UNDERSTANDING OF
THE AGREEMENT IS THAT THE GOVERNMENT CAN USE MY
CLIENT'S STATEMENTS IF HE TAKES THE STAND AND TESTIFIES
IN A MANNER INCONSISTENT TO THOSE STATEMENTS PROVIDED
TO THE GOVERNMENT DURING THE COURSE OF ITS
DEBRIEFINGS.*

MS. POTEAT:  THAT'S NOT RIGHT.

THE COURT:  I DIDN'T THINK IT WAS –

MS. POTEST:  THAT'S NOT THE PLAIN LANGUAGE.

THE COURT:  I DIDN'T THINK IT WAS THAT LIMITED.

.

.

.

MR. RUDASILL:  IN LIGHT OF THE COURT'S RULING, MY
CLIENT HAS RECONSIDERED HIS TRIAL ELECTION. HE WILL BE
A WITNESS IN THESE PROCEEDINGS ON HIS OWN BEHALF.

(November 5, 2007, A.M. Session, T.4-28) (emphasis in original).

Prior to, and during debriefing sessions, trial counsel advised Mr. Downs that any
statements that he made during plea discussions could be used against him for
impeachment purposes only if he "testifie[d] in a manner inconsistent to those
statements." As illustrated by the trial court's ruling in this matter, trial counsel's advice
to Mr. Downs was incorrect.  Therefore, any decisions made by Mr. Downs regarding the
government's use of debriefing statements were based on inaccurate information
provided by counsel. Counsel's error caused Mr. Downs to waive his Fifth Amendment
right against self-incrimination – Mr. Downs had elected not to testify, counsel's error
caused Mr. Downs "reconsider his trial election" - - to take the stand where he was
forced to admit to several criminal acts. Trial counsel's misapprehension regarding use of
statements made by Mr. Downs during the government's debriefing also caused counsel

to present several character witnesses whose testimony was inconsistent with debriefing statements, thus opening the door for impeachment.

Mr. Downs further argues, that the trial court's opinion that Mr. Downs was electing not to testify, because he was "agreeing that … the evidence [was] sufficient for him to be convicted," could not be further from the truth. In fact, after hearing the government's case and listening to the character testimony, Mr. Downs believed the evidence to be insufficient to sustain a conviction. Thus, there was no need to testify (the same trial strategy adopted by co-defendants, Hargrove and Bryant, whom were both acquitted). Had Mr. Downs not testified, he would not have been convicted in this case.

Mr. Downs cites a number of opinions in support of his argument in this case. In *Ostrander v. Green*, 46 F.3d 347 (4th Cir. (Va.)) (1995), the misadvice concerned eligibility for work release and the good prospect of receiving it quickly. Ostrander, if convicted on all charges, and all sentences were imposed consecutively, could have received as much as 75 years in prison. Counsel assured Qstrander that his sentence would be "capped" at three to four years, that the Commonwealth had agreed to work release, and that Ostrander's work release was guaranteed. *Id.* at 349.

The Fourth Circuit determined that Ostrander received ineffective assistance of counsel in connection with his decision to plead guilty to certain sexual offenses; counsel incorrectly advised him that he would be eligible for work release and had a good prospect of quickly receiving it. That counsel's misadvice fell well below the range of competence expected from defense lawyer. *Id.* at 355.

The case at bar is also somewhat similar to *United States v. McCoy*, 215 F.3d 102 (D.C. Cir. 2000). The Court of Appeals for the District of Columbia held that counsel's miscalculation of the applicable Guidelines range, on which the defendant relied when he entered a guilty plea, was ineffective assistance. Defense counsel informed his client that he would face 188 to 235 months in prison under the plea agreement offered by the government. However, counsel failed to apply the career offender provision of the Guidelines when calculating the sentencing range. McCoy pled guilty. When McCoy reviewed the presentence report, he moved to withdraw his plea. The district court denied the motion, and sentenced him to 262 months imprisonment to be followed by five years of supervised release.

On appeal, McCoy argued that his plea was unconstitutional because it was based on ineffective assistance of counsel. The District of Columbia Circuit agreed; it noted that McCoy's guilty plea had not been knowingly and voluntarily made, and that the district court had abused its discretion when it denied his motion to withdraw the plea. While noting that not every error made in calculating and applying the Guidelines would constitute deficient performance under *Strickland*, the Court emphasized the "familiarity" with the structure and basic content of the Guidelines (including the definition and implications of career offender status) has become a necessity for counsel who seek to give effective representation. *Id.* at 108. The Court further found that the prejudice prong of the *Strickland* test was satisfied, in that the difference between the sentencing ranges was so significant that there was a reasonable probability that if McCoy's had been given the correct information he would not have entered a guilty plea. *See also, United States v. Nguyen*, 262 F.3d 998 (9th Cir. 2007) (Even if present counsel is competent, a serious breakdown in communication can result in inadequate defense. *United States v. Musa*, 220 F.3d 1096, 1102 (9th Cir. 2000), *cert. denied, Musa v. United States*, 531 U.S. 999 (2000); *United States v. Nguyen*, 262 F.3d 998 (9th Cir. 2001).

These cases recognize the proposition that a defendant invariably relies upon the expert advice of his counsel during decision-making and providing such advice is a legitimate and essential part of the attorney's professional responsibility to his client. In Mr. Downs's case, where there were discussions with the government concerning plea bargain negotiations, it was a necessity for counsel to be familiar with the procedures regarding the government's use of the statements made by Mr. Downs during debriefings on that basis, as well as provide Mr. Downs with accurate information concerning the use of said statements. Here the guilty verdict was the product of trial counsel's misapprehension – erroneous advice regarding the government's use of Mr. Downs's statements that he made during plea discussions. Absent counsel's misapprehension – erroneous advice, Mr. Downs would not have taken the witnesses stand and incriminated himself, which, in effect, caused the jury to render a guilty verdict. He would have continued to exercise his Fifth Amendment right against self-incrimination, and would not have testified at his trial.

In this case, Mr. Downs incorporates all allegations and arguments, *supra*, as if fully detailed herein – under the umbrella of ineffective assistance of trial counsel. Trial counsel's representation of Mr. Downs was deficient in several respects. The "cumulative effect of the numerous lapses," individually and collectively constitutes prejudicial error. Trial counsel's representation fell below acceptable standards of reasonableness and should result in a reversal of the conviction and vacating of the sentence and judgment.

### IV.  RELIEF SOUGHT

Mr. Downs respectfully requests that this Honorable Court:

A.      Order a hearing be held where he may present evidence and argument in support of this motion;

B.      Allow him to freely amend this motion; and

C.      Grant him such other and further relief as law and justice may require.

Respectfully submitted,

By_____
        John Downs III

### CERTIFICATE OF SERVICE

**I HERBY CERTIFY** that on _____, April_____, 2008, a copy of the foregoing Memorandum was mailed first-class, postage prepaid, U.S. mail, to Elisabeth Poteat and Emory V. Cole, Assistant United States Attorneys, Narcotics Section, U.S. Attorney's Office for the District of Columbia 555 Fourth Street, N.W., Washington, D.C. 20530.

_____

John Downs III

A.    Order a hearing be held where he may present evidence and argument in support of this motion;

B.    Allow him to freely amend this motion; and

C.    Grant him such other and further relief as law and justice may require.

Respectfully submitted,

By_____
    John Downs III

## CERTIFICATE OF SERVICE

**I HERBY CERTIFY** that on _____, April_____, 2008, a copy of the foregoing Memorandum was mailed first-class, postage prepaid, U.S. mail, to Elisabeth Poteat and Emory V. Cole, Assistant United States Attorneys, Narcotics Section, U.S. Attorney's Office for the District of Columbia 555 Fourth Street, N.W., Washington, D.C. 20530.

_____
John Downs III