# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL NO. 06-227 (RBW)** |
| | : | |
| **v.** | : | **Judge Reggie B. Walton** |
| | : | |
| **JOHN DOWNS III,** | : | |
| **Defendant.** | : | |

**GOVERNMENT'S RESPONSE TO MOTION FOR NEW TRIAL**

I.      Factual Background:. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        a.      Investigative History.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        b.      Arrest and Statements.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        c.      Procedural History and Plea Negotiations.. . . . . . . . . . . . . . . . . . . . . . . 6

        d.      Debriefings.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        e.      Trial Preparation and Continued Plea Negotiations.. . . . . . . . . . . . . . . . 16

        f.      Motions Hearing and Continued Plea Negotiations.. . . . . . . . . . . . . . . . . 18

        g.      Trial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21


II.     Issues Presented.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32


III.    Argument.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        a.      Legal Standard.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        b.      False Allegations and Points of No Error.. . . . . . . . . . . . . . . . . . . . . . . . . 35

        c.      Any Conflict of Interest was Waived and Downs was Not Prejudiced. . . . . . . . . 37

        d.       Downs's Assertion of his Right to Testify was Personal and Informed All Tactics.
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

        e.      Advising Downs to Testify was a Valid Tactical Decision.. . . . . . . . . . . . . . 40

        f.      There was no Attorney Ineffectiveness and No Cumulative Impact... . . . . . . . . . 42


IV.     Conclusion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby requests that this Court deny defendant's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33(a). As grounds for this response, the government offers the following points and authorities.

I.    Factual Background:

a.    Investigative History.

This case began in 2005 as an investigation with the Federal Bureau of Investigation (hereinafter "FBI") into the drug activities of Darnell Jackson (hereinafter "Jackson"), a wholesale supplier of phencyclidine (hereinafter "PCP"). As part of the investigation, Special Agents Timothy Ervin and Jesus Gomez (hereinafter "Ervin" and "Gomez") obtained judicial authority to wiretap Jackson's mobile telephone since he was their primary suspect in the conspiracy. The wiretap began in May 2006, and lasted less than 30 days. Agents also conducted surveillance on Jackson and Troy Hopkins, who was later identified as one of the leaders of the conspiracy. On May 12, 2006, agents overheard John Downs, III (hereinafter "Downs" or "defendant") talking to Jackson. Call 2434, May 12, 2006. Jackson told Downs that "[his] shit had come in and that he needed 14 to get two people out the next day. Agents were aware that Jackson was using female couriers to get the PCP from a source on the west coast and they correctly interpreted that Jackson had received a shipment of PCP and needed to get two female couriers out on a flight the next day in order to get more PCP. In a follow-up call the next day, May 13, 2006, Jackson was overheard telling Downs that he was getting his "people out on the 1:00 p.m. flight," after which Downs replied that he would go see his "people" right then. Call 2495, May 13, 2008. Agents understood that Downs was promising Jackson money to help get female couriers to California and that Downs was going to collect drug-monies owed him

by his customers and pass it on to Jackson. While conducting surveillance on Hopkins' home, agents eventually observed Jackson riding in a Range Rover driven by Downs. While there, Jackson got out of Downs' sport utility vehicle (hereinafter "SUV") and engaged in what appeared to agents to be a drug transaction.

On May 24, 2006, while the wiretap was still running, agents seized two gallons of PCP from two female couriers, Lanika Franklin and Tinesha Adams, after they arrived at Dulles International Airport (hereinafter "IAD"). Immediately after this seizure, agents overheard Jackson telling Downs that "the two bitches" had told him that "they took the shit at the airport." Jackson complained to Downs that he disbelieved the couriers' claims that law-enforcement had seized the PCP, telling Downs, "That's bullshit, because they would have gotten locked up." Call 6229, May 24, 2006.

On July 27, 2006, a Grand Jury returned an Indictment charging 14 individuals, including John Downs, III, (hereinafter "Downs" or "defendant") with Conspiracy to Distribute and Possess With Intent to Distribute Phencyclidine in violation of Title 21 United States Code, Section 846. Magistrate Judge Alan Kay issued a bench warrant for Downs' arrest at the time the Indictment was returned.

A nationwide take-down took place on August 1, 2006, during which time most of the defendants were arrested and numerous search warrants were executed. Agents did not know where to locate Downs and he remained one of the few defendants not arrested on that date.

b.     Arrest and Statements.

On August 3, 2006, Downs was located where he was living at his sister's house in Maryland. Agents Tucker Vanderbunt and Timothy Foster advised Downs that they had a warrant for his arrest. Tr. September 25, 2007, , pp. 32-33. Exhibits 67A and 67-B. Agents provided Downs with a consent to search form for both his bedroom, located in the basement of his sister's home, and his Range Rover

SUV, which was parked near Downs' sister's home. Id. Downs informed agents that he had attended a couple of years of college, presumably indicating he could read and write. Id. at 39. Downs signed the consent form agreeing to allow agents to search his room and the Range Rover without first obtaining a warrant. Id. at 36-37. Downs was allowed to get dressed before he was escorted from the basement. Id. at 46-47. Agents discovered that Downs had Darnell Jackson's wallet and keys with him. Id. Agents arrested Downs on the outstanding bench warrant, and after taking him back to the FBI's Washington Field Office (hereinafter "WFO"), they advised Downs of his right to remain silent. Id. at pp. 35-37. Downs waived his right and agreed to speak to agents without an attorney present, telling agents that he had read and understood the waiver of rights form. Id. 37-39, 66. Exhibit 68-A.

Downs told agents that he purchased PCP approximately eight times from Darnell Jackson in quantities that ranged from one to four ounces and that he paid Jackson $200 per ounce. Id. Downs explained that he would later re-sell the PCP in the area of "New Town" in Annapolis for $400 an ounce, or for $15 per "dipper" (meaning a PCP-soaked cigarette). Id.

  c. <u>Procedural History and Plea Negotiations</u>.

After Downs' arrest, Attorney James Rudasill, Jr. was appointed to represent him. Rudasill is an attorney with more that 20 years of trial experience in the District of Columbia, including numerous trials in the U.S. District Court for the District of Columbia. Rudasill was advised by Assistant United States Attorneys S. Elisa Poteat and Emory V. Cole, that his client had made statements regarding his participation in the conspiracy and had been intercepted on a court-authorized wiretap.

Attorney Rudasill met with Downs on August 7, 2006, at the District of Columbia Jail for over two hours. In that first meeting, Downs told Rudasill that he had purchased PCP and resold it

consistent with his earlier statement to agents. Downs explained his educational background to Rudasill, which included three years of college. Downs further told Rudasill that he had voluntarily consented to the search of his home and his car and that he had voluntarily spoken to agents aware of his right to remain silent. On August 9, 2006, Rudasill represented Downs at the detention hearing before Judge Kay and took copious notes on the government's proffer of evidence. Downs was held without bond pending a status hearing set before Judge Reggie B. Walton.

Almost immediately Dierdre Peters, Downs' sister, began communicating with Attorney Rudasill and suggesting how he should handle the case. Peters, who has no legal education and no experience in U.S. District Court, is a highly educated woman with a master's degree in telecommunications management. Tr. September 25, 3007, at p.71. Peters requested that Rudasill file a bond review motion with Judge Walton and she further suggested that the government's case, as told to her in reduced form through various intermediaries, was simply wrong. By way of explanation, Peters told Rudasill that her brother "was not interested in drugs." Rudasill listened to Peters, aware that his professional loyalty was not to Peters, but to his client, Downs. Rudasill was mindful of the fact that Downs' family was anxious about his circumstances.

At another conference at the jail on August 10, 2006, Downs protested to Rudasill that he had not made "big money" dealing drugs. Rudasill explained that a lack of significant profits was not a defense to conspiracy but could implicate Downs' role in the conspiracy. Down explained that he had also worked in the music business with Jackson, and that most of their interactions were related to the music business and not to drugs. Rudasill noted Downs' concerns and explained that, even if Downs also had legitimate business with Jackson, if he participated in several PCP transactions he could still be convicted of conspiracy by a jury. Downs told Rudasill that he was in possession of Jackson's

wallet and keys when he was arrested because he had been given them by Jackson's girlfriend.

On August 13, 2006, Rudasill began to request business records for Downs' family members in an effort to follow up on Downs' assertions that he and Jackson were partners in the music business. The business records consisted of a series of flyers for events that Downs and Jackson had promoted. Further, Rudasill learned from government's lawyers that Downs had not reported any income from his music business to the Internal Revenue Service.

On August 15, 2006, Dierdre Peters again telephoned Attorney Rudasill and began asking him to file specific motions in the case even though she had no legal training. Rudasill noted her concerns and her suggestions mindful of her deep affection for her brother.

On August 22, 2006, Rudasill again met with Downs at the jail. Downs advised Rudasill that he knew Jackson cut the PCP he sold with starter fluid. He protested having been charged with Jackson since, he explained, he had received a couple of bottles of PCP that were without potency and had to be returned. He went on to explain that he never sold bottles of PCP but only dippers. He admitted that he sold these dippers in the New Town section of Annapolis. Downs said he only sold a couple of times a month, and generally only when he had lost money on a music show. Rudasill filed a bond motion on behalf of Downs after he learned that Downs had attended college and had several family members in the Maryland suburbs. The motion was denied by Judge Walton.

August 24, 2006, Rudasill went to see Downs at the jail again where they discussed the circumstances of his arrest and other topics relevant to his potential defenses and motions. Downs explained that he had been taken to the FBI's WFO where he was placed in a room with no windows. Downs again admitted to agreeing to talk to agents and to signing the waiver of rights form, but explained he only did so after he asked agents, "What about a lawyer?" Rudasill carefully outlined

Downs' alleged time-frame of events on the day of his arrest.

After hearing Downs' version of events, Rudasill had some concerns about Downs' ability to prevail at trial or on any motion to suppress statements. Based on Rudasill's considerable experience before the District Court, he suggested to Downs that he might want to consider cooperating with the United States and pursue a cooperation plea agreement. Rudasill explained cooperation to Downs. Rudasill also told Downs about his experiences with other clients who had cooperated with the United States and later been sentenced by Judge Walton. Further he told Downs that Judge Walton could be trusted to sentence fairly, though he could not predict what Downs' sentence would be. Rudasill told Downs his concerns about Downs' ability to prevail at trial given his post-arrest statement to agents and the government's evidence.

On August 28, 2006, Dierdre Peters again had a phone conference with Attorney Rudasill during which time she made suggestions for how best to defend her brother. After a phone conference with government lawyers on the case, Rudasill downloaded a standard debriefing letter provided to Downs by undersigned counsel.

d.    Debriefings.

Between the date of Downs' arrest and Rudasill's receipt of the standard debriefing letter, Rudasill advised Downs about his experiences, his view of the evidence, and his concerns about Downs' defense. Specifically, he told Downs that he had appeared before Judge Walton since 1984. Rudasill explained to Downs that his case would be hard to win. Although Judge Walton was fair-minded, Rudasill explained, Judge Walton was also a former Deputy National Drug Czar with little affection for people who dealt drugs. Rudasill told Downs that Judge Walton would have great latitude and discretion in making factual findings in support of evidentiary and procedural motions.

9

Rudasill said that any motion to suppress statements, even accepting Downs' version of events, might not succeed based on Downs' equivocal invocation of his right to counsel. Rudasill further explained that Downs' claim that he did not understand his rights would be severely undercut by the fact that he spent three years in college. Rudasill cautioned that, based on his experience, jurors tended to ascribe great weight to a defendant's admissions. He opined that Downs' defense - involvement in the music business with occasional PCP sales - was problematic and uncertain, even under the defense of "mere buyer and seller relationship."

Turning his attention the government's offer to debrief Downs, Rudasill advised Downs that it was the practice fo the U.S. Attorney's Office to debrief a defendant before making a cooperation offer in order to determine whether a defendant could give substantial assistance and thereafter earn a downward departure motion. Rudasill explained that, although the United States Sentencing Guidelines were no longer mandatory, the statutory minimum under Title 21 United States Code, Section 841(a) would still apply if Downs were convicted. Further, the government could add a request in any departure motion to have the Downs sentenced below the minimum 10-year sentence if he provided substantial assistance. If Downs did not cooperate and was convicted, he would face 262 months to 327 months in prison. Rudasill added that, based on the fact that Downs presented himself as a clean-cut young man, a guilty plea followed by cooperation, and sincere expressions of remorse would be the best choice under the circumstances.

Rudasill explained the debriefing letter to Downs in person. He also told Downs how the government could not use his debriefing statements unless Downs later testified or presented a defense inconsistent with his statements during the debriefing. Rudasill did not highlight the fact that Downs' debriefing statements could be used in court if Downs presented a defense inconsistent with those

statements since he did not imagine at that point that Downs would ignore his advice and proceed to trial. However, Rudasill did tell Downs about this provision as he read through and explained the letter.[1]

Rudasill even met with Downs' family and explained to them the significance of certain wiretap calls and how he believed they would be received by a jury.

On August 31, 2006, Downs met with FBI agents and government lawyers. In the presence of several witnesses, Attorney Rudasill explained the essential components of the debriefing letter. Specifically, he explained that if Downs agreed to its terms, the government could not use anything he said during the debriefing in its case-in-chief. However, if Downs later testified or presented witnesses who contradicted his statements in the debriefing, the government could use his debriefing statements to impeach them. Assistant U.S. Attorney Elisa Poteat repeated this explanation of the letter to Downs. Downs agreed to the terms of the debriefing and signed the letter. He then gave a lengthy proffer about his relationship with Darnell Jackson and his involvement with PCP.

Downs stated that he had known Jackson for about a year and that their acquaintance came about through a shared interest in music production. The two men had worked together coordinating shows on Friday evenings until about December of 2005. At that point, Jackson began providing Downs with liquid PCP. From December through March 2005, Jackson sold Downs two ounces on six or seven occasions. Downs explained that he re-sold the PCP and used the proceeds to fund shows that he and Jackson were promoting. Around March 8, 2006, Downs said he was in the apartment

---

[1]

Neither Rudasill or government's counsel knew until the pre-sentence report was prepared that Downs had actually been convicted in the past. Indeed the government's exercise of due diligence did not reveal this fact.

above Jackson's club, The Senate Inn, when he observed a 32 ounce Gatorade bottle containing PCP. The bottle appeared to be 75% full. Jackson told Downs that his son would be flying to Los Angeles to buy more PCP. Downs went on to state that he celebrated his 28th birthday on the evening of March 10, 2006, at the Senate Inn. That same evening, Jackson returned from Los Angeles and told Downs that he had gotten more "water," meaning PCP. Either the following day, or two days later, Downs explained, he purchased eight ounces of PCP from Jackson. After that purchase, Downs began purchasing four ounces of PCP from Jackson at a time. He did so on at least seven occasions. On only one occasion, he said, did he purchase eight ounces of PCP. At least one PCP transaction took place at the Family Furniture Store off of Central Avenue in Maryland. Downs explained that he would make 30 PCP cigarettes from an ounce of PCP. He would then sell the dippers for $15 to $20 apiece. Downs said that the PCP Jackson sold him was frequently of a poor quality and he sometimes returned it. When asked about a certain wiretap call, Downs said that he sometimes placed poor quality PCP in a shed at Jackson's town home in Odenton, Maryland. Downs admitted that he recalled the wiretap call in which he discussed putting $1,000 in Jackson's shed, but he explained that he never actually placed the money there. Downs said that he knew Jackson had female couriers who transported the PCP because Jackson had told him about the couriers. He explained that he only took one trip to California with Jackson and the purpose of that trip was to see the BET Awards ceremony. Downs then reviewed a series of photos and identified several other people who were part of the conspiracy. When he came to the photo of Troy Chavious, Downs talked about how he had seen Chavious with a gun at Troy Hopkins' house. Downs explained that Chavious thought they were going to be robbed and he ran in the house to get the pistol. Chavious then came back outside where he was joined by approximately eight people, at least two of whom also had pistols. Downs admitted that, in the past,

12

he had purchased PCP from another source named "Patrick."

Throughout the first part of September 2006, Rudasill reviewed the evidence in the case, including the videotapes, wiretap calls and other evidence. On several occasions he spoke to Dierdre Peters who inquired about the progress of her brother's case.

During this time, government's counsel began preparing a plea offer involving Downs' anticipated cooperation in the hope that Downs would elect to enter a guilty plea and to testify for the United Sates. No promises or offers of release were part of the plea offer and the plea discussions.

On September 22, 2006, Downs met with FBI agents and government's counsel again for a further debriefing. Downs explained how he went to the BET Awards in Los Angeles with Jackson and Keith Roots, and how he attended several "after" events. The following morning, he and Jackson and others ate breakfast. Then Downs and Keith Roots then flew back to the Washington, D.C. area, while Jackson and Hopkins remained in Los Angeles. Downs did not know if Jackson bought any PCP after he left him in Los Angeles. Downs again explained that he mostly interacted with Jackson when he was working the door to Jackson's club, The Senate Inn. Downs repeated that he had seen a 32 ounce bottle of Gatorade in the apartment above The Senate Inn. He also talked once again about the time he drove with Jackson and wound up at Troy Hopkins' house after Jackson told him that they he needed to "go see Troy." Downs repeated the story about having seen the various players at Hopkins' house pick up guns when they thought they were going to be robbed. He talked more about the people who armed themselves in defense of Hopkins' house. Downs explained in greater detail how he would get PCP from Patrick Coclaugh when he was in college, and sell it near his home in Annapolis. Downs explained he would later take the money from these PCP sales back to college.

Following these two debriefings, the government made a cooperation plea offer to Downs.

13

Rudasill presented the offer to Downs, who balked at the government's inclusion of the "gun bump" (even though he had admitted knowing about the pistols at Hopkins' house), and the drug amounts (even though the amounts in the letter reflected amounts attributable and foreseeable to Downs). As part of the back-and-forth negotiations, the government agreed to allow defense counsel to argue against the "gun bump" at sentencing as a condition of the plea. Further, Agent Gomez met with Downs to calculate the math regarding the drug amounts so that Downs would understand why he would be responsible for more than a kilogram of PCP. In that meeting Downs expressed disagreement with the established law of the conspiracy and appeared to want a different set of rules to apply to him personally than apply to all criminal defendants similarly situated. Eventually, on the date set for the plea, Downs refused to enter the guilty plea.

Downs later told Rudasill that he wanted the government to guarantee it would file a departure motion. He further wanted the government to guarantee a five year sentence, and he would not accept the fact that government's counsel had no authority whatsoever to guarantee such a sentence. Moreover, it appeared that the defendant's sister, Dierdre Peters, had counseled the defendant not to accept the plea offer, since, based on her untutored opinion, he could do better. Rudasill attempted to explain the legal system again to Downs' family and to Downs since it appeared they believed the legal system was a matter of price negotiation, much like buying a car. They refused to accept Rudasill's experience-based and fact-based opinions. Rudasill would later attend a meeting with government's counsel wherein Dierdre Peters would admit that she counseled her brother not to accept the government's plea offer because she did not want him to have felony conviction.

In the meantime, the government located other fugitives on the case and began acquiring cooperating witnesses. Rudasill repeatedly visited Downs in jail throughout the fall and spoke to his

14

family.  He explained Downs' sentencing exposure to Dierdre Peters, who telephoned Rudasill not

infrequently to suggest courses of action even though she had no legal experience.  The negotiations

regarding the defendant's plea continued through January 2007.  Rudasill reviewed all of the wiretap

calls and other evidence with Downs in person.  He discussed the "buyer-seller" defense to conspiracy

with Downs and the risks inherent in such a defense.  Rudasill also discussed again what Downs'

sentencing exposure would be.

In the spring 2007, Rudasill again reviewed Downs' post-arrest statement to the FBI to see if

there were any legal grounds to attack its admissibility.  Further, Rudasill began to drill down on the

facts that would establish a buyer-seller defense to conspiracy.  His overriding concern was the  fact

that Downs had begun to insist on his personal, Sixth Amendment right to testify.  Rudasill warned

him that if he testified, he would be roundly impeached with the contents of his debriefings.

In April 2007, Rudasill reviewed the plea offer again with Downs, who said that, for personal

safety issues, he did not want to cooperate.  He stated that he wanted to investigate money issues in

the case.  He asked Rudasill to file a motion for relief from prejudicial joinder, which Rudasill

understood would not likely succeed given the facts of the case.  He pressed Rudasill to file a motion

to suppress statements, and claimed that he wanted Rudasill to file a motion alleging that he could not

get a fair trial before Judge Walton.  Downs went on to say that he wanted Rudasill to allege a bad

faith prosecution.  He claimed that the government had made false statements to the Grand Jury,

though he did not even have the transcripts at that point.  Downs wanted Rudasill to claim that Downs

had made a fundamental mistake of fact when he became involved with Jackson.  Recognizing that

Downs' suggestions were dubious at best, Rudasill reviewed the principle of "mere buyer-seller" with

Downs.  Downs stated that he wanted Rudasill to advise government's counsel that he would not take

a plea and that he was going to trial.

In late May 2007, Downs told Rudasill that he had withheld some information from the government during the earlier debriefings. Downs now claimed that Jackson once told Downs that his uncle, Darnell "Homicide" Jackson, had murdered someone on behalf of Jackson many years earlier. Downs authorized Rudasill to report this to government's counsel and to "make a deal for cooperation, but I want to walk away," meaning he wanted the government to assure him a time-served sentence, even though the government was not authorized to assure such a sentence. Rudasill advised Downs that he would ask for such a concession. Rudasill contacted government's counsel who explained that no specific sentence would be promised to any cooperator, certainly not one coming forth with such information at a late date when the government could not be sure of the true source of such information. Thereafter, Downs debriefed with the United States again, claiming that Jackson had told him the information about the murder. Government's counsel explained to Downs that no cooperator would promise him any sentence in return for his information since cooperation agreements were not made for a promised sentence. Downs asked for a five year sentence and the government explained it would not offer such a sentence in advance of Downs' testimony. Rudasill attempted to explain the practice in such situations, but Downs appeared to become upset that Rudasill was providing him with information based on considerable experience in District Court.

Eventually the government confronted Jackson with the information and learned from several witnesses that Jackson had nothing to do with the murder of the individual, but instead had committed an earlier manslaughter.

e.    Trial Preparation and Continued Plea Negotiations.

In June 2007, Rudasill again reviewed motions with Downs, including a motion to suppress

16

statements, a motion to sever the defendant from the co-defendants, and a motion opposing exclusion of time under the Speedy Trial Act. They also discussed the intent element of the offense of conspiracy. Throughout June 2007, Rudasill conferred with Downs and the defense investigator. On June 26, 2007, Downs stated that he wanted to go to trial and would not accept a guilty plea. Downs directed Rudasill to communicate his rejection of the offer specifically to AUSA Elisa Poteat. Then, in an apparent contradiction of his rejection, Downs instructed Rudasill to tell Poteat that he would not accept an offer of more than ten years.

In the run-up to trial, Dierdre Peters began emailing Rudasill with suggested motions, most of which Rudasill knew from considerable experience lacked merit or would be unlikely to change Downs' circumstances. Peters sought a greater role in the relationship between Downs and his lawyer, and increasingly countered any advice Rudasill gave Downs with her own advice, however ill-informed. Peters demanded Rudasill explain why he was not filing non-meritorious motions and sent emails to Rudasill demanding that certain motions be filed. She instructed Rudasill to contact lawyers for the co-defendants, and accused Rudasill of under-representing her brother because he did not repeatedly file bond review motions, which would likely have been futile. In particular, she demanded that Rudasill file a motion she styled as Motion for Insufficient Indictment, which would not have been appropriate, and a Motion for a Bill of Particulars, which would not likely have succeeded given the government's discovery and thorough recitation of the facts in its various motions. Moreover, Peters continued attaching far greater significance to certain motions than an experienced practitioner would have. She compiled lists of character witnesses whom she wanted to testify for Downs and emailed

the names of these witnesses to Rudasill.[2]

In September 2007, with trial mere days away, Downs announced to Rudasill that he wanted to start having joint conferences in the jail with Troy Hopkins and his attorney. Downs stated that he had talked to Hopkins and Cary Clennon, Hopkins' lawyer, about these joint conferences already.

Downs and Rudasill discussed Downs' potential trial witnesses. Miscalculating the value of the government's evidence, Downs told Rudasill that the prosecution had little evidence of his sales of dippers in Annapolis. Rudasill repeatedly advised Downs about the defense of buyer-seller relationship and its significant limitations. Downs in turn repeatedly asserted his personal right to testify, never agreeing that he would sit back and hold the government to its burden of proof. Rudasill warned Downs that, in order to present his defense, he might have to testify and that would result in the contents of his debriefings coming in as impeachment. As he explained to Downs, Rudasill did not think the buyer-seller defense could be established absent testimony from Downs, particularly when so little documentary evidence supported Downs' claim that he and Jackson were mostly business partners.

f.    Motions Hearing and Continued Plea Negotiations.

Eventually, on September 24, 2007, Downs' case began in earnest with pre-trial motions. Dierdre Peters testified that the agents arrested her brother and that her brother executed a waiver allowing agents to search his truck and room. Tr. September 25, 2007, at pp. 76-77. Downs testified about his arrest and stated he had signed the waiver forms allowing agents to search his room and his

---

[2]

Downs became upset when co-defendant Lawrence Bryant was released on his personal recognizance, and he became skeptical when Rudasill explained that the government's evidence against Bryant was very different from the evidence against Downs.

car. Id. pp.84-85. At the hearing Downs testified that he had attended three years of college. Id. at p. 83. Downs said that he had never been arrested before. Id.[3] Downs said that agents asked him a few questions at his sister's house before he executed his waiver of his right to remain silent, and that he made many substantive statements at the FBI's WFO before he signed the rights waiver form. Id. 97-91. Mindful that these earlier statements might be suppressed, Rudasill elicited from Downs the statements he made before waiving his rights so that the Court could sort out which statements were pre-waiver and which post-waiver. Id. 87-93. Further, Downs testified that Agent Tucker Vanderbunt had made certain statements to him that made him believe he was not entitled to have a lawyer before he talked. Id. On cross-examination, Downs adhered to his position that the majority of details he provided to agents were given prior to his waiver of rights. Id. at 108-123. Further, in response to a question by the Court, Downs stated that he felt he had to talk to agents, "[b]ecause when I asked them for the lawyer, he pretty much batted me down. He just said, 'If we get you a lawyer, we are not going to be able to help you or you won't help yourself.' So I pretty much - - he showed me the paper, and I pretty much thought that was the only way I could get out of it." Id. at 129. Downs then added, "The agent said that I had to sign the form, you know, in order for them to make it admissible, I guess." Id. at 130. Downs was not impeached with his prior conviction because government's counsel did even know about it at the time he testified.

Agent Tucker Vanderbunt testified that Downs consented to the search of his car and house in writing, and that, afterwards, he transported Downs to the FBI's WFO along with Agent Timothy

---

[3]

Downs later admitted Deputy Probation Officer Kelli Cave that, not only had he been convicted of a criminal offense before, but he had undergone a trial in Maryland and been convicted in 2002. Pre-Sentence Report, p. 8, ¶38.

Foster.  Id at 138-140.  Vanderbunt testified that, prior to arriving at the WFO, he did not question

Downs.  Id. at 140-141.

Correctly characterizing the choices facing the Court, Rudasill noted that the Court was called

upon to make a credibility finding, since Downs' testimony about his statements and his waiver of

rights contradicted the testimony of Agent Vanderbunt.  Id. at 161-163.[4]  Rudasill argued that his

client's candor with the Court about the content of his statements enhanced his overall credibility, and

that the Court should credit Downs' claims of having made most of the statements before he executed

the waiver of rights.  Id. at 166-167.  Further, Rudasill argued that his client had made an unequivocal

request to speak to an attorney and that this request had been ignored by the agents.  Id. at 167-168.

The Court agreed with Rudasill that it was called upon to make a credibility judgment in the case.  Id.

at 169-179.  However, based on the agents' note-taking, which supported his version of events, the

Court found Agent Vanderbunt's testimony to be credible, and declined to suppress the evidence.  Id

at 170-178.

That evening, after court was recessed, government's counsel met with Dierdre Peters, Downs'

sister.  Attorney Rudasill also attended the meeting in the hallway of the courthouse.  Peters, whose

intelligence is obvious, said that she had counseled her brother not to accept the government's plea

offer, contrary to the advice of his lawyer.  Government's counsel, Elisa Poteat and Emory Cole,

explained to Peters why they thought a plea was in her brother's best interest.  At the conclusion of

the meeting, government's counsel agreed to return to the U.S. Attorney's Office and again request

---

[4]

During the motions hearing Rudasill explained that he did not separately file a motion to suppress
evidence since he believed that a finding of a lack of voluntariness by Downs to the search would
result in the suppression of the evidence.  Id. at 165-166.

authority to extend the plea offer to the defendant. The next day, the government re-communicated its last cooperation plea offer. Downs rejected the offer and insisted on going to trial.

g.     Trial.

On October 2, 2007, the Court gave its opening instructions to the jury. The Court fully explained the defendant's right to hold the government to its burden of proof stating :

> . . . [I]f the defense deems it appropriate, they also have a right to present defense evidence to you, but they are not required to do that because, again, they don't have the burden of proof and, therefore, need not present evidence." Tr. October 2, 2007, pp. 25-26.
>      "Your function is to determine whether the government has proven the charges against the defendants beyond a reasonable doubt." Id. at 30. ". . . [Y]ou are instructed that every defendant in a criminal case is presumed to be innocent. The presumption of innocence remains with a defendant throughout the trial, unless and until he is proven guilty beyond a reasonable doubt." Id. at 35-36.

Rudasill gave an opening statement outlining the defense. However, he carefully avoided placing the contents of the debriefings before the jury and focused his remarks only on the post-arrest statements he knew would come in as evidence. Consistent with the defense he intended to present, Rudasill explained the jurors that Downs was a person of promise who went to college and later worked in the family's lawn care business. Id. at 130. Downs had the misfortune to meet Darnell Jackson, a major witness against Downs, whom Rusadill characterized as the most culpable person in the case, and the son of perdition. Id. Downs was not a major distributor of PCP, and the government would not be able to present any evidence that they recovered PCP from his hands, Rudasill said. Id. 131-132. Rudasill noted that, although the government would claim that more than 700 calls took place between Downs and Jackson during the wiretap, that the government would present precious few that were drug-related, and most of those calls would actually be about the music

business. Id. at 132. Focusing on his anticipated defenses of mere buyer-seller relationship, Rudasill emphasized that Downs had no relationship to any of the defendants on trial, and that he only bought PCP on eight occasions from Jackson. Id.at 132-235. In those few buys, the product was so adulterated, Downs returned it to Jackson and did nothing more to enter or participate in the conspiracy. Id. at 134-136. Rudasill explained that Downs' only travels with Jackson were related to the music business - a single flight to the BET Awards Ceremony. Id. at 136. Rudasill explained, consistent with what Downs had told him, that the few wiretap calls the government could present were either related to the music business or involved Downs listening to Jackson but not acting in support of his conspiracy. Id. at 136-137. Rudasill even told the jurors that his client had Jackson's keys when arrested only because he received them from a female and not from Jackson. Id at 138. Rudasill emphasized that the government could not present any reliable evidence that Downs sold PCP on the streets of Annapolis. Id at 138-139.

On October 3, 2007, Special Agent Timothy Ervin testified that the FBI used an informant to conduct a series of buys from Jackson on March 9, 2006, March 23, 2006, and June 13, 2006, with that buy concluding at last on July 5, 2006. Tr. October 3, 2007, pp. 45-55. Ervin testified about the seizure of two gallons of PCP from couriers Lanika Franklin and Tinesha Adams when they arrived at Dulles Airport via a JetBlue flight from Long Beach on May 24, 2006. Id. at 55-63. Ervin testified about shooting videotape of various conspirators during surveillance on Troy Hopkins' parents' home in Maryland on May15, 2006. Id. at 64-70, Exhibit SV-11 through SV-15. Ervin also explained how wiretaps were obtained and how they were used in investigations and in the instant case. Id. at 25-47. Ervin explained to jurors that, during the investigation, he had serious concerns about Jackson's credibility and that he had advised the Grand Jury of his concerns and had sought, wherever possible,

to corroborate everything that Jackson said. Id. at 80-84.

On October 3, and October 4, 2007, courier Tinesha Adams testified about her involvement it the conspiracy. Adams testified at length to her relationship with Troy Hopkins and how she had transported PCP for Hopkins and others, and recruited other couriers. At no point on direct or cross did Adams indicate that she knew or had business dealings with Downs.[5]

The government then called series of witnesses to the other crimes evidence against Troy Hopkins. These California-based witnesses testified about the events in January 2004, when a large amount of PCP was seized from hotel rooms and couriers. Among the witnesses to testify was Los Angeles Sheriff's Deputy John Cater, who testified that he stopped two drug couriers as they made their way through Burbank Airport. Id. at 100-120. Although Cater did not have evidence relevant to Downs, Rudasill cross-examined Cater about certain facts. Id. However, that cross examination elicited no evidence prejudicial to Downs whatsoever. Id. at 123-125. In response to questions from the Court, Rudasill said that he believed that he was should try to establish that the overall conspiracy did not exist as a tactical matter. Tr. October 11, 2007, at pp.73-75.[6] Rudasill got Chavious to admit that he had never seen Downs sell or buy PCP and that he had never had any conversations with Downs about PCP whatsoever. Id. at 50-52. More to the crux of Downs' defense, Rudasill got Chavious to admit that on May 15, 2006, when agents were videotaping Jackson and Downs arriving

---

[5]

Rudasill cross-examined Adams. Tr. October 9, 2007, pp. 15-30. Adams indicated she did not know Downs to transport or sell PCP. Id. at 15. The Court questioned Rudasill about why he bothered to attempt to show Adams lacked credibility. Id. at 18. However, no statements prejudicial to Downs were elicited.

[6]

This appears to have been ane error since Cater was testifying about other crimes evidence ruled extrinsic to the conspiracy. However, no evidence contrary to Downs was revealed by this cross-examination.

the Hopkins' family home, Chavious did not know whether any PCP was ever purchased by Jackson.

Id. at 53. This tended to undermine the government's theory that, on May 15, 2006, Downs came with

Jackson to Hopkins' home to buy PCP in furtherance of the conspiracy.  Further, Rudasill got

Chavious to admit that he had not seen Downs among the people who took up armed defense of the

Hopkins' family home that day, thereby making it clear to the jury that Downs was not himself armed

on that occasion.  Id.  Focusing on his specific defense theory, Rudasill got Chavious to testify that he

saw Downs at the Senate Inn where Downs worked in the legitimate music business, and that he never

knew Downs to be involved in the PCP business.  Id. at 54-55.  Having been handed a note by Troy

Hopkins, Rudasill elected to ask a "clean -up" question for Hopkins about Chavious' true motivation

for leaving Virginia Beach for the Maryland Suburbs.  Id. at 55.   When asked about his questioning,

Attorney Rudasill again explained that he was trying to eliminate the jury's belief in the conspiracy.

Id. at 59.  At no time did he elicit any evidence or testimony that was adverse or prejudicial to Downs.

In response to questioning by this Court, Rudasill explained that he believed it was the responsibility

of every attorney in a conspiracy case to attack witnesses to the overall conspiracy.  Id. at 62-64.

Rudasill then explained that he had been asked to help with Hopkins' defense.  Id. at 67.  The

following exchange took place:

> Rudasill:     I have discussed this matter with my client and have his consent to
> proceed in the fashion that . . .
> The Court:    Somebody should be telling me this stuff.
> Rudasill:     I have also had discussions with Mr. Clennon concerning his client's
> request, and Mr. Clennon agreed to my proceeding in this fashion.
> The Court:    Well, it's good that we know this because if there is ultimately a
> conviction in this case, I think the Court of Appeals needs to understand that this
> arrangement – which is strange to  say the least – has been worked out. And therefore,
> if either client gets hurt because of your tactics, or somehow Mr. Hopkins gets hurt by
> your tactics, that the Court of Appeals understands that they bought in on this and,
> therefore, any argument they could make about being adversely affected by what

24

happened has been waived.

Now I think I have a right – and I should have been told about that if such an arrangement had been worked out. We could have done this, obviously, *ex parte* so the government wouldn't have known what was going on. But I just think that it's inappropriate for lawyers to take on this type of tactic that conceivably could have the impact that I think it could have and the Court not know about it. I mean, I would assume that if there was a conviction, if this hadn't happened, and this revelation hadn't been made, that if the case went up on appeal and there was some type of allegation about ineffective assistance because of what has taken place, that counsel would have told the Court of Appeals, "We had an agreement about this and, therefore, we waived any challenge that could be made out in that regard." Id. at 71-75.

Rudasill went on to explain his arrangement with his client and Defendant Hopkins, stating:

"I haven't taken any position inconsistent with my client's interests." Id. at 75. He added:

I have not elicited – you can have the court reporter read the record. I have not elicited any damaging information to my client. And I will fully state the record here. I have received no compensation from Mr. Hopkins' family. I have not interviewed Mr. Hopkins in any manner without his attorney being present, just in the cellblock. Mr. Hopkins, at the beginning of this trial said, 'I have spoken to your former client, Mr. [Tommy Edelen]. He says that you are the best lawyer he knows. Would you please assist my attorney in the case, if you can, because you know the judge wouldn't let me have the attorney I wanted. Would you assist me and help Mr. Clennon in the case?' I said, 'To the extent I can, consistent with my responsibility to represent Mr. Downs, I will.'" Id at 80.[7]

After sending all of the other defendants away, the Court inquired of Downs. Id at 88-89. Mr. Downs, the reason I have had everybody leave the courtroom is because I just want to make sure that you understand what your rights are and that you not end up being hurt by tactics that are being taken that may not necessarily benefit you. I can understand, as was just indicated, that there may be circumstances where a witness who hasn't hurt you might not, nonetheless, be somebody who had to be attacked because, if you consider that witness' testimony, or the overall theory of the government's case, that, conceivably, there may be a need to attack the witness even though that witness didn't directly hurt you.

The concerns I have had on several occasions have been that nobody has really

---

[7]

Mr. Katzoff advised the Court that he had no joint defense agreements. Id at 83. He added, however, that sometimes in joint trials for conspiracy "attorneys have attacked witnesses that haven't hurt them because sometimes it attacks the government's theory in general. Id. Thereafter the Court stated that it could understand such an approach. Id. at 84.

said anything about you that would be a justification for you being found guilty in this case. At this point, that hasn't happened.

Now, where somebody else will say something that will implicate you in this crime, I don't know because I don't know the case as well as the lawyers do. But as far as the witnesses who have testified to this point, none of them, in my view, has anything that would show that you were involved in drug activity. This last witness, yes, he does put you at Mr. Hopkins' house with Mr. Jackson after Mr. Jackson made a call and indicated that he wanted to buy PCP, and the government says that they have another call that will also indicate that Mr. Jackson was going to buy PCP that day.

Maybe the fact that you were with Mr. Jackson at a time when he was going to buy PCP might cause the jury to conclude that you were involved in that activity also. I don't know if that's true or not, but I could see how your lawyer in that regard might want to challenge this witness on whether he is being truthful because of the potential of your being with Mr. Jackson might be thought by the jury to indicate that you were involved in this conspiracy with him.

But the other witnesses were there was an attempt to challenge them in reference to their testimony, I didn't see where that would hurt you. Now I understand, based upon what I have been told by your lawyer, that there ha[s] been some type of agreement worked out whereby your lawyer will provide assistance to Mr. Hopkins. There are situations where defendants and their lawyers will agree that lawyers will work together for the joint benefit of their clients, and I understand that.

And I just need to know that you understand that if there is such an agreement[,] and if your lawyer, in his efforts to try to help Mr. Hopkins hurts you, and if you have agreed to that, that you are going to be waiving or giving up any right that you could raise later if you get convicted and then you want to say, 'Well, my interests were hurt because my lawyer, rather than totally having alliance to me, was also trying to help one of my co-defendants, and because of his attempt to help my co-defendant, that hurt me, and otherwise maybe I wouldn't have been convicted and, therefore I want to raise a claim of ineffective assistance of counsel' – which you will be, in my view, giving up if you agree to go along with an agreement where things are being done that aren't necessarily to your benefit and it's hurting you, and you end up getting convicted when maybe otherwise you wouldn't.

So I just want to know that you understand that in your lawyer doing what he is doing and attacking witnesses who maybe haven't hurt you, that if that comes back to haunt you and you end up having that adversely affect your interest, that it's then going to be very difficult for you at some point later on to say, 'I didn't get a fair trial because of what my lawyer did.'

Do you understand everything that I said?

<u>Downs</u>: Yes. . . From my understanding, they all - - he told me that he was going to be cleaning up because - - anyway, that' basically what I have been seeing.

<u>Court</u>:  Well, I mean, if you are confident that you are receiving the type of representation that you want, and you fully understand that - - I mean there always is the potential - - you know, lawyers have different tactics, and you know, it has been a

long time since I practiced law, and I am not saying I know it all . . . As long as you understand that and you are willing to go along with this agreement, which I understand you are supposed to know about, that there is some agreement that your lawyer will provide assistance to Mr. Hopkins during this trial - - as long as you understand the potential adverse effect it could have on your case and you are willing to proceed in that fashion, I guess you have the right to do that.

You seem like an intelligent guy. If you want to make that call, that's on you. But like I say, if ultimately it ends up acting to your detriment, then you are going to be hard-pressed later to say, "I didn't get a fair shake." Do you understand that?

<u>Downs</u>: I understand. <u>Id</u>. at 88-94.

Attorney Rudasill stated again that his loyalties were with his client, John Downs, III, and that he would do nothing to cause him prejudice. <u>Id</u>. at 94. Downs repeated that he was comfortable with what Rudasill was doing in the case. <u>Id</u>. at 95. The government then summarized its evidence against Downs in front of him. <u>Id</u>. at 95-98.

During a break in the proceedings, Rudasill, who was exasperated, complained off-the-record but in open court that he felt Judge Walton was prejudiced against him because of a series of old murder cases he had won before Judge Walton in the 1990s. This fact was not communicated to Judge Walton at the time, nor transcribed the court reporter, and the case continued. However, Downs' family apparently heard this complaint and felt alarmed.

In trying to resolve any possible issue of conflict, Judge Walton went on to state:

Mr. Downs says he was aware of this agreement [wherein Rudasill could ask clean-up questions], and I think the record clearly would show that, with that awareness, he went along with it. I don't think it creates any real issue in reference to a conflict that conceivably would inure to his detriment at this point." <u>Id</u>. at 102.

The government continued with its presentation of evidence. Custodians of records of various airlines testified, supporting Downs' claim that he had only flown to California at the time of the BET Awards Ceremony. <u>Tr</u>. October 16, 2007, pp. 5-77. Darnell Jackson testified that he knew Downs

and fronted him PCP. Tr. October 18, 2007, at p. 94. Jackson identified several locations where he would meet people for drug transactions, including his sister's house on 51st Street, S.E. Washington, D.C. and the Senate Inn. Id. at 112-114. Jackson said he met Downs throwing music parties in Annapolis, and that Downs worked the door at the Senate Inn on Friday nights. Id. at 118-119. Jackson testified that he had seen Downs selling dippers, and he had seen him selling cocaine. Tr. October 22, 2007, a.m. at p.8. Before any objection could be made, government's counsel interrupted and asked Jackson to state the largest amount of PCP he had ever sold to Downs at one time. Id. Jackson said that he had sold between eight and 16 ounces of PCP to Downs. Id.[8] Jackson explained The Senate Inn was closed down for health code violations in the winter of 2006, many months before the wiretap and take-down. Id. at 22. Jackson then talked about several wiretap calls between Troy Hopkins and himself around the dates of May 12, and May 13, 2006, and how the two men were discussing PCP transactions. Id. at 37-40. He also talked about calls with Downs wherein he told Downs to give him money for PCP couriers whom he needed to fly out from California. Id. at 42-43. In a second call, Jackson told Downs to hurry up and give him the money for the couriers. Id. at 47-48. Several other calls from the same days were played to show that Jackson was talking with several people about PCP sales. Id. at 47-50. Jackson told the jury that, on May 15, 2006, he rode with John Downs to Troy Hopkins' house and he identified himself and Downs in an FBI video-surveillance tape. Tr. October 22, 2007, p.m., at pp.10-12. Jackson said that he got a call from Hopkins about PCP, so he told Downs to drive to Troy's house. Id at 13. Jackson testified in chronological order

---

[8]

Unfortunately for the government, one of the most important audiotapes the implicated Bernie Hargrove could not be heard when the government played it at trial. This hurt the government's case against Hargrove. Id. at 21.

about all of the wiretap calls and events that were memorialized in FBI surveillance tape. Id. 13-25.

He then talked about some additional wiretapped telephone calls he had with Downs. Id. Jackson

indicated that, on May 21, 2006, he told Downs to put $1,000 under the trash can in his storage shed

so that he could get airline tickets for two female couriers. Tr. October 22, 2007, a.m. at pp. 62-65.

Jackson testified about a series of calls he had with Troy Hopkins about getting couriers out with PCP

from California on May 23, 2006. Tr. October 22, 2007, p.m. at 11. At the end of one of these calls,

Jackson told Hopkins that he was going to get $3,000 from Downs that Downs owed him, a statement

in furtherance of the conspiracy. Id. at 12. On the 24th of May, Tinesha Adams and Lanika Franklin

were stopped at IAD with two gallons of PCP in their checked luggage, having flown there from Long

Beach. Upon learning about this seizure, Jackson called Downs. Id. at 30.[9] He told Downs about the

seizure of the PCP, and said that he thought that if the couriers were telling the truth then they should

have been arrested. Id. at 30. When asked why he told Downs the PCP had been seized, Jackson

replied, "Because everybody was waitin', you know, for the water to come in." Id. at 31. For the next

several days, Jackson was cross-examined by all defense counsel.[10] This cross-examination was

vigorous and lengthy and focused thematically on Jackson's past lies. The last person to cross-

examine Jackson was Rudasill. Rather then re-hash and dilute the effectiveness of the earlier cross

which had successfully painted Jackson as a liar, Rudasill focused on the fact that Jackson's testimony

and calls showed him to be more violent person than he had wanted to appear to the jury. Tr. October

---

[9] He did not call Hargrove or Bryant at all during this highly important time-frame.

[10] Cary Clennon, the attorney for Troy Hopkins, cross-examined Jackson about a call he had with Downs which had already been admitted into evidence. Tr. October 23, 2007, pp. 52-56. Counsel for Downs did not object to this line of cross-examination since the call in its entirely had already been played to the jury and Jackson had already been aggressively cross-examined.

24, 2007, a.m., at pp. 45-50.    Rudasill also tried to put before the jury Downs' claims, that Jackson told him he owed his uncle a debt of gratitude for taking care of (murdering) a witness against him in another case.  Id. at 51-53.  Further Rudasill attempted to impeach Jackson with information that Jackson had shot a drug runner many years earlier.  Id. at 52.  Rudasill was not permitted to ask about this matter, though he certainly made efforts to elicit such impeachment.  Id. at 53-54.  Rudasill continued to focus on Jackson's alleged brutality, since Jackson's veracity had been thoroughly undercut during the cross-examination by other counsel and repeating such cross-examination would only dilute its impact on the jury.  Id.  at 54-55.  A contentious debate ensued over whether Rudasill could cross-examine Jackson about his involvement in the murder of a witness.  Id. at 55-64.  Rudasill aggressively sought to present this information to the jury mindful of the fact that, if he could further undermine Jackson's credibility, it would enure to Downs' benefit.  Id.  At length Rudasill argued as follows:

> I am attempting to lay a foundation to impeach this witness with a statement against penal interest that he made to my client.  That statement was relative to a homecoming party given April 29, 2006, for his namesake uncle, Darnell Homicide Jackson.  That statement was made while they were in a vehicle traveling to Chris, the photographer's office, to pick up the fliers for that show.  And my client wanted to know why he was going through such an effort for his uncle.  He said, I got to do this because my uncle put in work for me, he handled this, I was charged in a homicide, and he took care of the witness for me.  I want to put that before the jury as a motive - - bias because all the 302s that he had - - interviews he granted the government from September 1st through June 14, 2007, do not mention fronting PCP to my client.  It is only after he had knowledge that Mr. Downs had disclosed that statement against penal interests by the briefing with Ms. Poteat and Mr. Cole and providing that information to them, that this arose.  Id. at 67-95.  (See also Id. at 68-95.)

Rudasill then focused on the narrow points wherein Jackson had contradicted himself.  Id. at 94-123.  He especially focused on the issue of fronting, a matter that would later become important to mere buyer-seller defense and which is addressed in the jury instruction on that defense.    At

the urging of Downs and Downs' family, Rudasill called several character witnesses to say that Downs was a decent fellow who did not sell drugs. At least two such witnesses corroborated Downs' claims that he was active in the music business. The last few of these witnesses were asked if they would change their opinion if they knew Downs had sold drugs in the New Town projects. At this point Rudasill elected to accept his client's demand for character witnesses. Further the witnesses, even if impeached, would bolster Downs' claims that he and Jackson were really music partners and not co-conspirators. After all of these witnesses had testified, Downs changed his view and briefly claimed that he did not want to testify. He then gestured to government's counsel and stood to testify.

Downs was given the jury instruction that applied to the defense of mere buyer-seller relationship.[11]

Eventually Downs was convicted of the charges in the Indictment.[12] Several days before the jury returned the verdict, a juror verbally told the deputy clerk that she was upset that other jurors were deliberating without her being present and that she felt threatened.[13] Nothing in her statement referenced Downs. After conferring with all counsel, Judge Walton instructed the jurors not to

---

[11]

The jury was instructed that,
> . . . merely because people get together and talk about common interests, or do similar things, does not necessarily show that an agreement existed to commit the crimes of distribution . . .[A] simple 'buyer-seller' relationship alone does not make participation in a conspiracy since a buyer does not automatically become a member of a conspiracy . . . Crim. Jury Instr. 4.93.

[12]

The significant event in the conspiracy was the seizure of gallons of PCP at Dulles Airport. Around that time, there were few communications between Jackson and Bryant and Jackson and Hargrove. In contrast, Downs and Jackson were speaking regularly on the wiretapped phone.

[13]

Prior to beginning their deliberations, Judge Walton instructed the jurors that "No member of the jury should try to communicate with me by any means other than a signed note . . ."

deliberate unless all them were present. The jury could not reach an agreement with respect to Hargrove and Bryant, and were divided in favor of acquittal.

II.    Issues Presented.

Downs now argues that his counsel was constitutionally ineffective and that but for counsel's errors, he would have been acquitted at trial. Specifically, Downs claims that: 1) his counsel told him that Judge Walton was prejudiced against his counsel in advance of trial, even though Downs never asked for a different attorney nor brought this worry to the Court's or the government's attention before or during trial; 2) that his attorney did not explain a government's debriefing letter to him in advance of him signing it, even though government's counsel and FBI agents witnessed Downs' counsel and government's counsel telling Downs about the significance of this letter before he signed it; 3) that the only reason he did not accept the government's plea offer was because he thought this Court was prejudiced against his attorney; 4) that his counsel did not tell him that the prosecution said he could get five years if he cooperated and pleaded guilty, even though no such statement was ever made by government's counsel to defense counsel during the plea negotiations; 5) that Downs was prejudiced because his attorney had a "conflict" which, if it even really existed, was waived by Downs on the record twice, and which resulted in no evidence prejudicial to Downs ever being elicited during questioning; 6) that his attorney was constitutionally ineffective for calling character witnesses whom Downs himself and Downs' family insisted should be called; 7) that, even though the evidence against two other defendants, Bernie Hargrove and Lawrence Bryant, was far less compelling than the government's evidence against Downs, this Court should forge a new and dubious legal theory about ineffectiveness, that is, if a co-defendant with different evidence is acquitted then Downs' too should have been acquitted, but for the errors of his attorney; and, 7) that but for the cumulative impact of

32

these alleged errors, Downs would have been acquitted.  Therefore, Downs argues, he should be given a new trial.

III.     Argument.

    a.     Legal Standard.

Downs moves this Court to give him a new trial under Federal Rule of Criminal Procedure. 33(a) which states, "Upon the defendant's motion, the [C]ourt may vacate any judgment and grant a new trial if the interest of justice so requires."

In order to prevail on a claim of ineffectiveness, the defendant must prove the following:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel make errors so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment.  Second, the defendant must show the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown of the adversarial process that renders the result unreliable.

Strickland v. Washington, 466 U.S. 668 (1984); Lopez-Nieves v. United States, 917 F.2d 645, 648 (1st. Cir. 1990).

Downs must demonstrate that 1) his attorney's representation was unreasonable under prevailing professional norms, and 2) that there was a reasonable probability that, but for counsel's unprofessional errors, the result of the initial proceeding would have been different.  Id.

When reviewing an ineffective assistance of counsel claim, this Court should make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Id. at 689. Further, there is a strong presumption "[t]hat counsel's conduct falls squarely within the wide range

of reasonable professional assistance." Id. at 689.    This  requires the defendant to "overcome the presumption that, under all the circumstances, the challenged action '*might* be considered sound trial strategy." Id.  Therefore, Downs bears the burden of  "showing that counsel's action or inaction was not based on strategic choice."  Wayne R. LaFave et.al., *Criminal Procedure* §11.10(c) at 715 (West 2nd 1999); *see also* Darden v. Wainwright, 477 U.S. 168, 186-87 (discussing presumption that counsel acted strategically).  Further, a defendant must show that "'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'"  United States v. Holton, 122 F.Supp.2d 21, 25 (Dist. D.C. 2000) *quoting* Strickland, 466  U.S. at 687.  Downs must show that,  "'counsel's errors were so serious to deprive the defendant of a fair trial, a trial whose result is reliable.'"  Id.

The Court must then decide whether, after "considering all of the circumstances," whether counsel's performance fell "below an objective standard of reasonableness."  Strickland, 466 U.S. at 688.  "[N]ot every error that conceivably could have influenced the outcome undermines the reliability of the resulting proceedings.  Id. at 693.

A sound tactical decision by defense counsel with which the defendant later purports to disagree cannot be the basis of an ineffective assistance of counsel claim.  Holton, 122 F. Supp.2d. at 227; United States v. Liquori, 5 F.3d 435, 439 (9th Cir. 1993), cert. denied 529 U.S. 1061 (1999); United States v. Smith, 198 F.3d 377 (2nd Cir. 1999), cert. denied 531 U.S. 864 (2000); *accord* Taylor v. Illinois, 484 U.S. 400, 434 (1988) (tactical decisions that may later appear erroneous is not necessarily ineffective).

"An actual conflict of interest exists where a lawyer is 'required to make a choice advancing his own [or another client's] interests to the detriment of his own client's interests.'" United States v.

Bruce, 89 F.3d 886, 893 (D.C. Cir. 1996) (quoting United States v. Lichfield, 959 F.2d 1514, 1518

(10th Cir. 1992)). A defendant can prevail on a conflict of interest claim if he can that, "(1) his lawyer

acted upon a conflict of interest, and (2) that the conflict had some negative impact on his defense []

defined as 'an actual lapse in representation.'" United States v. Thomas, 114 F.3d 228, 252 (D.C. Cir.

1997), cert. denied 522 U.S. 1033 (1997) quoting Cuyler v. Sullivan, 446 U.S. 335, 342 (1980).

However, where a defendant waives his right to conflict-free counsel, he has no ground for

appeal on this score. See Bonin v. California, 494 U.S. 1039, 1043 fn. (1990) (Justice Marshall and

Brennan dissenting write that they would have granted cert. noting a waiver of conflict would have

resolved the issues raised in the petition for cert.).

      b.      <u>False Allegations and Points of No Error.</u>

Most of the claims made by Downs are false and cannot provide a foundation for a legitimate

claim of ineffectiveness.

Downs claims that the only reason he did not plead guilty was because his counsel told him

that Judge Walton was prejudiced against him are revisionist history. On the contrary, Attorney

Rudasill told Downs that he *should* plead guilty, documented this advice, and took pains to provide

Downs with examples of past instances of fairness on the part of Judge Walton. Rudasill properly told

Downs that Judge Walton was a jurist who had previously served as the Deputy Drug Czar spear-

heading anti-drug efforts for the former president, and that he did not pity drug dealers as some jurists

fashionably did. Indeed, Rudasill's notes, the emails exchanged between government's counsel and

defense counsel, and the history of plea negotiations reveal that Downs refused to plead guilty because

the government would not give him the plea offer he wanted. He did not reject the plea because he

feared the wrath of Judge Walton. Further, it appears that Downs elected to take his own advice, and

the advice of his highly intelligent sister, over the advice of his seasoned counsel. Throughout all of is plea negotiations, Downs' main dispute with the government's offer was that the government insisted he take responsibility for acts - drug amounts and firearm usage - that he could foresee as a member of the conspiracy in keeping with the law of conspiracy. However, Downs wanted his criminal responsibility to be limited to his own drug purchases minus any drugs he thought were of poor quality. In this regard, Downs ignored his attorney's explanation of the law of conspiracy. In addition, Downs clearly wanted to trade information for sentencing promises and he treated the plea negotiations like a car purchase wherein he reasoned he could "just walk away from the deal" if it were not to his liking. He thereby grossly miscalculated the dynamics of the criminal justice system and discounted his lawyer's advice.

Certainly Attorney Rudasill's exasperated comments in open court about Judge Walton's alleged dislike of him were poorly-considered in light of the fact that Downs' family, deeply concerned about his welfare, already misunderstood the subtleties of the criminal justice system and wanted Downs to be treated fairly. However, there is no reason to believe that these off-hand remarks made during the heat of trial, formed the basis for Downs' rejection of the plea. Indeed, at Downs never point out his concerns to the Court nor did he allege they had rendered him fearful of pleading guilty. Instead Downs haggled over drug amounts and gun bumps never mentioning any concern that Judge Walton might treat him unfairly because of concealed hostility towards his attorney. Indeed, months after trial, Judge Walton expressed shock that Attorney Rudasill would say such a thing since he felt no hostility toward him whatsoever.

Downs falsely claims that he did not understand the debriefing letter he signed and he now refers to himself as an unsophisticated young man despite his college education. This is not true. The

letter was explained to Downs by his counsel in advance of the first debriefing with government's counsel. It was explained to him again by his attorney and government's counsel before he signed it. Downs, a man with three years of college education who had previously had a trial for a misdemeanor offense, understood the letter. His claims to the contrary are wrong. Indeed, at the point when Downs executed the letter, he had expressed an interest in resolving his case by way of a guilty plea and cooperation with the government. A debriefing was the logical next step in that process.

Downs also falsely claims that the government promised his counsel that he would only get five years incarceration and would be released pending sentencing, or a sentence to that effect. This is not true.[14] The various versions of the debriefing letter all show that the government made no promise to Downs in exchange for his plea and the letter was crafted anticipating that Downs would not be released. Downs was told he faced a mandatory minimum of ten years under the statute. As a procedural matter, government's counsel would have to receive approval of the Departure Committee before advocating for a sentence under the guidelines and statute. Hence no such claim or promise was made to anyone, and certainly not to Downs' counsel who knew very well the procedures in such cases. As a practical matter, It is difficult to say how Downs would have fared had he followed his attorney's advice and pleaded guilty since that never occurred. However, it is certainly no point of error that Downs was not advised of a sentencing option that had never been made by the government.

c.    Any Conflict of Interest was Waived and Downs was Not Prejudiced.

Downs also claims that he suffered prejudice because his attorney was laboring under a conflict

---

[14]

Remarkably, Attorney Mark Carroll takes out of context banter between himself and government's counsel to the effect that his client should have taken the plea deal because it would have resulted in a lower sentence. This claim is false and Carroll misunderstands the policies of the Departure Committee, and forgets the discretion of U.S. District Court Judges to sentence as they see fit.

of interest thereby rendering him ineffective.  "A defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."  Cuyler v. Sullivan, 446 U.S. 335, 348 (1980) (internal citations omitted).  The only persons who raised concerns about a conflict of interest in this case were Judge Walton and government's counsel.  In keeping with the mandate in Federal Rule of Criminal Procedure 44(c), and Holloway v. Arkansas (435 U.S. 475, 480 (1978)), Judge Walton inquired of the defendant and explained in painstaking detail that Rudasill's assistance to Hopkins could potentially hurt Downs.  Having been warned in direct terms, Downs waived his conflict.[15]

Although a showing of prejudice is not required by Cuyler if the defendant objects, Downs cannot reasonably rely on Cuyler because he never objected to the conflict.  On the contrary, Downs suggested this joint approach to his defense when he asked for joint conferences at the jail well before trial started.  Further, he ultimately waived any conflict in keeping with his apparent desire to have a cooperative approach to the defense, once again ignoring his counsel's advice.[16]

In addition, Downs must show that any conflict of interest "actually affected the adequacy of his representation" before he is relieved of his obligation to show that prejudice.  Id. at 349-350.  No testimony that prejudiced the defendant was ever elicited.  Downs cannot and does not cite any facts adverse to him that were revealed when his attorney asked "clean up" questions at the end of cross-

---

[15]

_See also_ Wheat v. United States, 486 U.S. 153, 160-162 (1988) (giving trial courts wide latitude to refuse such waivers when the facts merit it).

[16]

In his brief Downs' attorney writes: "The Court observed that there were two other very experienced lawyers in the case and they were not doing the same thing."  He then cites this Court to United States v. Thomas, 114 F.3d 228, 252 (D.C. Cir. 1997).  Thomas does not support the comparison of two attorneys' work.

examination of several of the government's witnesses.[17]   While Rudasill discredited witnesses who said they did not know Downs to sell drugs, Rudasill attacked them to prevent the jury from believing that there was an over-arching conspiracy, which is a valid tactic in any conspiracy case.   Most importantly, when the possibility of a conflict was raised by the government, Judge Walton took a painstaking waiver wherein he warned Downs that his assent to any conflict could cause its waiver for all time.[18]   Judge Walton even explained exactly what he perceived was the problem with the conflict, that is, that witnesses who had not hurt Downs by their testimony were being discredited by Rudasill. Downs still waived the conflict and said he was in agreement with counsel's tactics.[19]

---

[17]

Rudasill repeatedly explained that he was trying to help Downs by asking questions of each witness geared to defeating the government's theory of an over-arching conspiracy.

[18]

Certainly Attorney Rudasill could have refrained from helping Defendant Hopkins. Since his client had already relegated him to second advisor after his sister and himself, the better course may have been to avoid any further complications.  However, no prejudicial testimony came out through his agreed-to cross-examination.  Moreover, Downs gave up any right he had to conflict-free counsel.

[19]

It is important to note that Downs does not claim that his trial counsel failed to investigate his case or was ignorant of law.  Nor does he claim that counsel's decisions to call character witnesses or present the defenses of "mere buyer-seller relationship" were deficient.  Instead he claims that because the jury could not reach a verdict against two of his co-defendants, that his counsel was deficient for not achieving the same result.

Downs appears to concede that the decisions made by his counsel were tactical.  Downs fails to note in his brief that the government's evidence against both Bryant and Hargrove was different than it was against Downs.  Further, Downs does not cite a single piece of authority that would support the dubious legal claim that defendants with disparate evidence should be compared to one another for purposes of measuring their counsel's performance.  Indeed such a comparison would be one lacking any legal or intellectual integrity.  In the instant case, the greatest confluence of activity occurred between May 21, and May 25, 2006, during which time Downs and Jackson talked, but Jackson did not speak to Bryant, and only spoke once to Hargrove about a broken-down vehicle.  Neither were Hargrove and Bryant photographed at Hopkins' house with Jackson around an important series of phone calls.

    d.    <u>Downs's Assertion of his Right to Testify was Personal and Informed All Tactics</u>.

Downs had a personal right under the Sixth Amendment to the Constitution to testify. "'Every criminal defendant is privileged to testify in his own defense or refuse to do so." <u>Rock v. Arkansas</u>, 483 U.S. 44, 52 (1987), quoting <u>Harris v. New York</u>, 401, U.S. 222, 230 (1971)); <u>Ferguson v. Georgia</u>, 365 U.S. 570, 582 (1961). Beginning very early on in his relationship with Attorney Rudasill, Downs said that he wanted to explain himself to the jury. His attorney warned him that testifying was unwise and would result in the content of his debriefings being revealed to the jury. However, Downs insisted that he would testify and Rudasill had to make tactical decisions around that likelihood. Moreover, Downs insisted on a defense which would be difficult to establish without Downs' own testimony. This put Attorney Rudasill in an untenable position since he could not present Downs' defense without Downs' testimony. He therefore told Downs that he feared he could not make out the buyer-seller defense without Downs' testimony, which was an honest and appropriate assessment of Downs' circumstances. Rudasill never told Downs that he was not protected by the Fifth Amendment privilege against self-incrimination. Also, Attorney Rudasill recognized that his client, a clean-cut former college basketball player, might be liked by a jury who could see him as a promising young man who had been hoodwinked into drug selling by a violent music promoter with a history of lying to the government.

    e.    <u>Advising Downs to Testify was a Valid Tactical Decision</u>.

The advice by a criminal defense lawyer on whether his client should testify is a "paradigm of the type of tactical decisions that cannot be challenged as evidence of ineffective assistance of counsel." <u>Hutchins v. Garrison,</u> 724 F.2d 1425, 1436 (4th Cir. 1983), *cert. denied*, 464 U.S. 1065 (1984); *see also* <u>Jones v. Murray</u>, 947 F.2d 1106, 1116 n.6 (4th Cir. 1991) (reiterating principle that

advice to testify is paradigmatic of strategic decision).  Further, it is an attorney's responsibility to advise a defendant, when he believes there is no other way to make out a particular defense, that a defendant should testify.  *See* <u>United States v. Teague</u>, 953 F.2d 1525, 1533 (11th Cir. 1992).

Rudasill correctly advised Downs that he would have to testify to present his buyer-seller defense.

With only some promotional flyers and no tax records to support his client's claim that most of his calls and interactions with Jackson had nothing to do with drugs and everything to do with music, Rudasill called character witnesses who uniformly said they knew Downs as a good person who would not sell drugs.[20]  This decision opened the door for the admission of the debriefing, but it was not unreasonable, since the debriefing arguably revealed nothing more than a mere buyer-seller relationship.  In fact, the witnesses on the whole testified that they knew Downs to be a music promoter and not a drug seller in keeping with Downs' theory that his drug purchases from Jackson were infrequent and few, and that he had not joined the drug conspiracy.  Downs does not assert that he was coerced into testifying or told he had no right to remain silent.  Therefore he cannot validly claim that Rudasill was unreasonable in choosing to put Downs' defense before the jury through Down's own voice.  This is especially true since Rudasill called a character witness to say that Downs's business with Jackson was just music, and that character witness had certain flaws - to wit a felony conviction and no knowledge of the fact that Jackson sold PCP to make a living thereby making him seem ill-informed.

---

[20] While Downs' sister and his friend testified that Downs was in the music the business with Jackson, neither witness could give a personal explanation for Downs' statements to the FBI nor push back against Jackson's assertion he had "fronted" Downs drugs.  Only Downs could do that.

f.    There was no Attorney Ineffectiveness and No Cumulative Impact.

Downs argues that his attorney's errors were numerous and that this Court should view them as a group and give him a new trial.  Further, without any support in the law or logic, Downs invites this Court to find that the jury hung as to Hargrove and Bryant, which he dubiously argues they would have done as to Downs were it not for certain alleged errors.  This theory of analysis should be rejected at the outset since the evidence was different and disparate as to each defendant.[21]  Downs cannot in good faith assign blame to Attorney Rudasill for Downs' repeated rejection of the plea offer.  Neither can he assign blame to Rudasill for having called him as a witness to testify since he claimed a defense that could not be established any other way.

It is without any intellectual integrity for Downs to claim that the evidence against him was identical to that of the co-defendants and that a jury would have acquitted him had his case been handled differently.

IV.    Conclusion.

Downs made his own decisions in this case as to how best to proceed.  He ignored whatever sage advice came his way and elected to take a risk at trial.  He cannot in good faith now claim that he was a mere victim of his attorney.  Therefore he is not entitled to a new trial, and his motion should be denied.

---

[21]

In addition, Downs invites this Court to speculate that a verbal complaint by a juror to the deputy clerk, made despite the Court's instruction not to communicate with the Court except in writing, somehow reveals that the jury was unsure of its verdict as to Downs.  Absolutely nothing in this juror's verbal message revealed any such leaning.  Further, her complaints were never made in writing or repeated and the Court cautioned the jury not to deliberate without her present.  The more likely scenario was that this juror had concerns over Defendant Hargrove who had given the FBI statements, but against whom the government's evidence at trial was significantly thinner.

WHEREFORE the government respectfully requests that the motion for a new trial be denied.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY
Bar. No 498-610

By:      _____/s/_____

S. ELISA POTEAT
EMORY V. COLE
Assistant United States Attorneys
Organized Crime and Narcotics Trafficking Section
555 4th Street, N.W., Room 4106
Washington, D.C. 20503
(202) 514-7067
Elisabeth.S.Poteat@usdoj.gov
Emory.Cole@usdoj.gov

*Certificate of Service*

I certify and an e-copy of the government's response to the defendant's motion for a new trial was sent to the attorney for the defendant, Mark Carroll, this the 15th day of August, 2008,

_____/s/_____
S. Elisa Poteat