UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| | * | |
| | * | |
| v. | * | Cr. No. 06-227 (RBW) |
| | * | |
| | * | |
| **JOHN DOWNS III** | * | |

**DEFENDANT'S REPLY MEMORANDUM TO GOVERNMENT'S RESPONSE TO**

**MOTION FOR A NEW TRIAL**

     COMES NOW ATTORNEY Mark J. Carroll, and hereby respectfully replies to the Government's response to the defendant's motion for a new trial. As grounds for this Reply Memorandum, counsel states the following based on information and belief.

     The government in its response sets forth in great detail the undue influence that Dierdre Peters, the defendant's sister, had in the decisions made by Mr. Rudasdill and the defendant in this case. (Government's Reply pp. 7-,9,14-15,17,20,36)  The government describes Ms. Peters as being highly educated women with a master's degree in telecommunications management but no legal background. (GR p. 7)

     The American Bar Association's Model Code of Professional Responsibility Ethical Consideration 5.1 (1983) states, "The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties. Neither his personal interests, the interests of other clients, nor the desires of *third persons* should be permitted to dilute his loyalty to his client." (emphasis added)

     The government's assertions reinforce the defendant's arguments that his defense was ineffective.  Mr. Rudasill should have recognized early on in these proceedings that Ms. Peter's

1

advice was contrary to her brother's interest and broken lines of communication with her. His loyalty should have been to his client and not his client's sister or her uninformed advice.

The Government in its reply (GR p.10) states:

> Rudasill explained the debriefing letter to Downs in person. He also told Downs how the government could not use his debriefing statements unless Downs later testified or presented a defense inconsistent with his statements during the debriefing. Rudasill did not highlight the fact that Downs' debriefing statements could be used in court if Downs presented a defense inconsistent with those statements since he did not imagine at that point that Downs would ignore his advice and proceed to trial. However, Rudasill did tell Downs about this provision as he read through and explained the letter.

This is completely contrary to the record. After having ten character witnesses testify for Mr. Down's, Mr. Rudasill told the government that Downs was not going to testify in his own behalf (Tr. 11-5 p4). The government requested permission of the Court to introduce evidence that the defendant was not a law abiding person in college (id. p 4). The Court stated that peace and good order or law abidingness are character traits that can go before the jury even if a defendant does not testify, but there should not be any testimony before the jury regarding truthfulness if he is not testifying (Tr. 11-5 p 4-5).

Mr. Rudasill asserted:

YOUR HONOR, WITH RESPECT TO THE GOVERNMENTS CLAIM THAT THEY HAVE THE RIGHT, UNDER ANY DEBRIEFING AGREEMENT, TO IMPEACH MY CLIENTS CHARACTER WITNESSES WITH THEIR TESTIMONY - WITH MY CLIENTS STATEMENT, RUNS TOTALLY AS AN AFRONT TO THE RULES OF EVIDENCE AND TO RULE 410. THAT RULE APPLIES TO THE DEFENDANT TAKING THE STAND AND AFFIRMATIVELY ASSERTING SOMETHING DIFFERENT, AND NOT HIS WITNESSES. AND IF HE DOES NOT TESTIFY, THERE IS NO BASIS FOR THE COURT TO ADMIT THIS ASSERTED REBUTTAL EVIDENCE. IT IS NOT REBUTTAL AS TO ANY STATEMENT MR. DOWNS MADE (Tr. 11-5 p 8).

This statement by itself shows that Mr. Rudasill had either not read the debriefing

statement in its entirety or that he just did not understand it. In either case it is ineffective assistance of counsel. When the Court ruled against Mr. Downs, Mr. Rudasill switched gears and then stated that Mr. Downs would indeed testify (Tr. 11-5 p. 28).

The government states in is reply (GR p. 18):

> In September 2007, with trial mere days away, Downs announced to Rudasill that he wanted to start having joint conferences in the jail with Troy Hopkins and his attorney. Downs stated that he had talked to Hopkins and Cary Clennon, Hopkins' lawyer, about these joint conferences already.

This too is contrary to the record. Mr. Rudasill advised the Court:

MR. RUDASILL: … I HAVE NOT INTERVIEWED MR. HOPKINS IN ANY MANNER WITHOUT HIS ATTORNEY BEING PRESENT, JUST IN THE CELLBLOCK. [behind the courtroom] MR. HOPKINS, AT THE BEGINNING OF THIS TRIAL, SAID, "I HAVE SPOKEN TO YOUR FORMER CLIENT, MR. [Tommy Edelen]. HE SAYS YOU ARE THE BEST LAWYER HE KNOWS. WOULD YOU PLEASE ASSIST MY ATTORNEY IN THIS CASE, IF YOU CAN, BECAUSE YOU KNOW THE JUDGE WOULDN'T LET ME HAVE THE ATTORNEY I WANTED. WOULD YOU ASSIST ME AND, YOU KNOW, HELP MR. CLENNON IN THE CASE?" ( Tr. 10-15 p. 80).

This was a onetime conversation initiated by Troy Hopkins and not by Mr. Downs.

The government in its reply also states that:

> Downs also falsely claims that the government promised his counsel that he would only get five years incarceration and would be released pending sentencing, or a sentence to that effect. This is not true.[14]
> [14] Remarkably, Attorney Mark Carroll takes out of context banter between himself and government's counsel to the effect that his client should have taken the plea deal because it would have resulted in a lower sentence. This claim is false and Carroll misunderstands the

3

      policies of the Departure Committee, and forgets the discretion of
U.S. District Court Judges to sentence as they see fit (GR p. 37).

Counsel for Mr. Downs in his motion for a new trial asserted, "It is to be noted that on February 20, 2008, the prosecutors in this case informed current counsel that they were prepared to ask the Court to give Mr. Downs time served for his sentence because his role was so minimal in this conspiracy. This was never communicated to Mr. Downs by Mr. Rudasill " (Defendant's Motion for a New Trial p. 87).

When two veteran prosecutors tell a defense attorney that if a defendant had pleaded guilty and cooperated he would have gotten time served; this has serious consequences. A reasonable inference can be drawn that both have a sense of how the Departure Committee at the United States Attorney's Office would have reacted based on the prosecutors' recommendations. An inference can also be drawn that they have had similar cases that they submitted to the Departure Committee and they (the prosecutors) got their desired result. This in no way implies that the Departure Committee is bound by the prosecuting attorney's recommendations. But it does imply that the prosecutors have a hand on the pulse of the Committee.

Additionally, this in no way disregards the discretion that a U. S. District Judge has in ignoring the government's recommendations for leniency.

The government in its reply states that any conflict of interest was waived and Downs was not prejudiced (GR p. 37).

> The only persons who raised concerns about a conflict of interest in this case were Judge Walton and government's counsel. In keeping with the mandate in Federal Rule of Criminal Procedure 44(c), and <u>Hollowayv, Arkansas</u> (435 U.S. 475, 480 (1978)), Judge Walton inquired of the defendant and explained in painstaking detail that Rudasill's assistance to Hopkins could potentially hurt Downs. Having been warned in direct terms, Downs waived his conflict (GR p. 39).

It is to be noted that even after this inquiry of the Court, government counsel was still not satisfied that the defendant's waiver was properly informed (Tr. 10-15 p. 91-92).

4

>THE COURT: SO I JUST WANT TO KNOW THAT YOU UNDERSTAND THAT IN YOUR LAWYER DOING WHAT HE IS DOING AND ATTACKING WITNESSES WHO MAYBE HAVEN'T HURT YOU, THAT IF THAT COMES BACK TO HAUNT YOU AND YOU END UP HAVING THAT ADVERSELY AFFECT YOUR INTEREST, THAT IT'S THEN GOING TO BE VERY DIFFICULT FOR YOU AT SOME POINT LATER TO SAY, "I DIDN'T GET A FAIR TRIAL BECAUSE OF WHAT MY LAWYER DID."
>
>DID YOU UNDERSTAND EVERYTHING I SAID?
>
>DEFENDANT DOWNS: YES.
>
>THE COURT: AND UNDERSTANDING --
>
>DEFENDANT DOWNS: FROM MY UNDERSTANDING, THEY ALL -- HE TOLD ME THAT HE WAS GOING TO BE CLEANING UP BECAUSE -- ANYWAY, THAT'S BASICALLY WHAT I HAVE BEEN SEEING.
>
>…
>
>MS. POTEAT: YOUR HONOR, CAN YOU INQUIRE --HE JUST SAID SOMETHING THAT I THINK IS IMPORTANT. WHAT HE SAID WAS THAT IT WAS HIS UNDERSTANDING THAT THE LAWYERS WERE JUST GOING TO CLEAN UP EACH OTHER'S WORK. HE DID NOT SAY THAT HE UNDERSTOOD THAT HIS ATTORNEY WAS ALSO GOING TO BE REPRESENTING MR. HOPKINS. AND IF WE COULD JUST SORT OF FOCUS ON THAT AND MAYBE - - BECAUSE WHEN YOU HAD HIM ARTICULATE BACK TO YOU WHAT HE UNDERSTOOD, I FEEL THAT WE GOT A PICTURE OF WHAT HE UNDERSTOOD, WHICH WAS NOT WHAT THE COURT IS ASKING HIM. (Tr. 10-15 p 93).

A further inquiry revealed that Mr. Rudasill had not really given Mr. Downs advance notice that he was going to cross exam witnesses on behalf of Troy Hopkins when these witnesses had done no harm to Mr. Downs. The following colloquy illustrates this point:

MR. COLE: THE GOVERNMENT RESPECTFULLY DISAGREES WITH MR. RUDASILL IN THAT HE SPECIFICALLY SAID MR. HOPKINS HAD TALKED TO HIM AND THEY HAD WORKED OUT A DEAL WHERE HE, MR. RUDASILL, WOULD BE AIDING AND ASSISTING MR. CLENNON IN THE DEFENSE OF MR. HOPKINS. HE SPECIFICALLY SAID THAT.

THE COURT: THAT'S TRUE. WERE YOU AWARE OF THAT?

DEFENDANT DOWNS: YES.

THE COURT: MR. DOWNS SAYS HE WAS AWARE OF THAT.
AND YOU ARE COMFORTABLE WITH THAT?

DEFENDANT DOWNS: YES, I AM COMFORTABLE. WE JUST TALKED.

THE COURT: AND SO YOU FEEL THAT YOU ARE RECEIVING THE QUALITY OF REPRESENTATION THAT YOU WANT TO RECEIVE FROM MR. RUDASILL?

DEFENDANT DOWNS: YES.

THE COURT: WELL, AS LONG AS YOU UNDERSTAND THAT. LIKE I SAID, I HAVE TOLD YOU WHAT MY CONCERNS ARE. MAYBE THEY ARE NOT LEGITIMATE CONCERNS, BUT THEY ARE CONCERNS THAT I HAVE. BUT IF YOU ARE WILLING TO LIVE WITH THAT REALITY, THAT'S YOUR PREROGATIVE.

SO IS IT YOUR VIEW THAT YOU WANT TO CONTINUE WITH THIS TRIAL AS IT HAS BEEN GOING WITH MR. RUDASILL ATTACKING WITNESSES UNDER CIRCUMSTANCES WHERE THOSE WITNESSES HAVEN'T AT LEAST DIRECTLY HURT YOU?

DEFENDANT DOWNS: HE JUST SAID HE IS NOT GOING TO DO IT ANYMORE. SO - -

THE COURT: BUT YOU KNEW AHEAD OF TIME THAT HE WAS GOING TO DO THAT --

DEFENDANT DOWNS: YES.

THE COURT: -- UP TO THIS POINT?

DEFENDANT DOWNS: YES, I DID.

THE COURT: AND YOU WERE IN AGREEMENT WITH THAT?

DEFENDANT DOWNS : YES . HE PRETTY MUCH SAID THEY ALL WAS GOING TO CLEAN UP AFTER EACH OTHER. SO THAT'S WHAT I SEEN GOING ON. (Tr. 10-15 p. 94-95)

…

MS. POTEAT: … AND MY BIGGEST CONCERN, AS I STAND HERE RIGHT NOW, IS THAT MR. DOWNS, IN ACQUIESCING TO THIS APPARENT CONFLICT, IS GETTING ALONG/GOING ALONG. AND THE PROBLEM THAT I HAVE IS THAT THE COURT'S INQUIRY IS EXACTLY WHAT IT SHOULD BE, BUT THE PROBLEM IS IT MAY NOT REACH THAT REALITY OF HUMAN DYNAMICS.

AND I AM CONCERNED THAT MR. RUDASILL, AS A PERSON OF SOME SOPHISTICATION AND CONSIDERABLE EXPERIENCE, REALLY SHOULD KNOW ABOUT THAT AND SHOULD NOT TAKE ADVANTAGE OF THIS WITH A YOUNG MAN OF THIS AGE. I DO HAVE SOME CONCERNS ABOUT THIS, YOUR HONOR. (Tr.10-15 p 103)

A reasonable inference can be drawn that realistically this was the first time that the matter had been discussed with Mr. Downs. Because of Mr. Downs' lack of sophistication with the law, and the manner in which he was being confronted with this issue, he could not properly give to the Court *informed* consent.

7

The government even later in the trial was not satisfied with the Court's prior ruling and was still not convinced that Mr. Rudasill was only representing Mr. Downs:

MS. POTEAT: AND THE PROBLEM IS I DON'T REALLY THINK -- AND WE HAVE ANOTHER THING.  IF HE STANDS UP HERE ONE MORE TIME, AFTER TELLING THE COURT YESTERDAY -- THE DAY BEFORE YESTERDAY -- WE HAVE THE TRANSCRIPT WHERE HE SPECIFICALLY STATED THAT HE WAS REPRESENTING MR. HOPKINS AS WELL -- AND HE STATES THAT HE ONLY REPRESENTS MR. DOWNS -- I THINK THE COURT SHOULD STOP HIM.

THERE JUST NEEDS TO BE SOME DECORUM.  I FEEL THAT THERE NEED TO BE SOME RULES OBSERVED HERE.  AND THIS BEHAVIOR -- IT'S BEGINNING TO AFFECT WHAT IS HAPPENING IN THE CASE IN A WAY THAT IS PREJUDICING EVERYBODY -- AND I INCLUDE, WHEN I SAY THAT, MR. DOWNS . (Tr. 10-17 a.m. p 77)

…

MS. POTEAT: WE FURTHER OBJECT TO HIM CONTINUING TO STAND UP, INTRODUCE HIMSELF TO THE JURY, REFERENCING THE YOUNG MAN, JOHN DOWNS, WHOM HE SAYS HE REPRESENTS, WHEN IN TRUTH, AND IN FACT, HE HAS TOLD US ALL HE REPRESENTS A KINGPIN AND A MINION IN THIS CASE -- WE FIND IT VERY, VERY INAPPROPRIATE, YOUR HONOR.  WE OBJECT. (Tr. 10-17 a.m.  p 78)

Thus not only did Mr. Downs not give informed consent, he suffered prejudice at the hands of Mr. Rudasill.  As the Court noted on repeated occasions, Mr. Rudasill's cross examination of government witnesses that did not inculpate Mr. Downs operated to his detriment (Tr.10-15 p. 67-103).

The government in its reply states, "In his brief Downs' attorney writes: 'The Court observed that there were two other very experienced lawyers in the case and they were not doing the same thing.' "  He then cites this Court to <u>United States v. Thomas.</u> 114 F.3d 228, 252 (D.C. Cir. 1997). Thomas does not support the comparison of two attorneys' work." (GR p 38 fn 16).

8

The defense did not cite Thomas in support of that proposition. The defense cited Thomas in the hope that the Court could be persuaded by its motion for a new trial that an actual conflict did it exists. *See* U.S. v. Thomas, 114 F.3d 228,252 (C.A.D.C., 1997). A defendant can prevail on a conflict of interest claim--a type of ineffective assistance of counsel claim--under Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), if the defendant can show (1) that his lawyer acted under "an actual conflict of interest" and (2) that the "conflict had some negative effect upon his defense (defined as 'an actual lapse in representation')." United States v. Shark, 51 F.3d 1072, 1075-76 (D.C.Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 405, 133 L.Ed.2d 324 (1995). A defendant who proves an actual conflict of interest thus avoids the more stringent requirement of proving that the lawyer's "deficient performance prejudiced the defense," Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), for such prejudice is presumed, United States v. Farley, 72 F.3d 158, 166 (D.C.Cir.1995). An actual conflict of interest exists where a lawyer is " 'required to make a choice advancing his own [or another client's] interests to the detriment of his client's interest.' " United States v. Bruce, 89 F.3d 886, 893 (D.C.Cir.1996) (quoting United States v. Litchfield, 959 F.2d 1514, 1518 (10th Cir.1992)).

The government in its reply states:

> It is important to note that Downs does not claim that his trial counsel failed to investigate his case or was ignorant of law. Nor does he claim that counsel's decisions to call character witnesses or present the defenses of "mere buyer-seller relationship" were deficient. Instead he claims that because the jury could not reach a verdict against two of his co-defendants, that his counsel was deficient for not achieving the same result.
> Downs appears to concede that the decisions made by his counsel were tactical. … (GR p. 39 fn 19)

In his motion for a new trial Mr. Downs did not claim that Mr. Rudasill had failed to

9

properly investigate this case as he felt that this was an undisputed fact with the government. This was established during Mr. Rudasill's cross examination of records' custodians. (Tr. 10-17 am pp 66-78)

    MR. RUDASILL: -- AND THE PRODUCTION?
    THE COURT: I MEAN, AS FAR AS I UNDERSTAND, THE ONLY THING HE KNOWS ABOUT ARE THESE RECORDS THAT ARE IN COURT TODAY. NOW, IF YOU WANT HIM TO TAKE THE TIME, I GUESS, AND GO THROUGH THE ENTIRE DOCUMENT AND SAY, "IS THERE ANY INFORMATION ON THE RECORDS THAT YOU BROUGHT TO COURT THAT INCLUDES THE NAME OF JOHN DOWNS?" I GUESS YOU CAN DO THAT.
    MS. POTEAT: I THINK THAT'S PROPER FOR ARGUMENT AT THE END OF THE TRIAL. HE CERTAINLY HAS ARGUMENT BUT --
    THE COURT: I MEAN IF THE WITNESS BROUGHT THE DOCUMENT -- I MEAN IF THERE IS NOTHING ON THE DOCUMENT THAT SAYS ANYTHING ABOUT JOHN DOWNS, I GUESS HE COULD SAY THAT.
    MS. POTEAT: OKAY. WE COULD HAVE HIM SIT HERE AND GO THROUGH 70 PAGES OF SPREADSHEETS. THAT'S FINE.
    THE COURT: IF WE HAVE TO DO THAT, WE HAVE TO DO THAT, BUT --
    MS. POTEAT: **AND I WOULD SAY THAT THIS IS NO SUBSTITUTE FOR A PROACTIVE DEFENSE** WHERE DEFENSE WITNESSES ARE BROUGHT IN IN ORDER TO ESTABLISH THESE FACTS. THIS IS JUST A BUSINESS RECORDS CUSTODIAN. HE HAS NOT SEEN THE SUBPOENA.
    AND ALL OUR CUSTODIANS IN THIS CASE HAVE BEEN SUBSTITUTED FOR THE PEOPLE WHO ORIGINALLY GOT -- THESE SUBPOENAS, JUST SO THE COURT KNOWS, GO TO SOME FACILITY IN THE MIDWEST. AND WE SPEAK TO THEM, AND WE OFTEN BELIEVE THEY ARE GOING TO PRODUCE THE INDIVIDUAL WHO RESPONDED TO THESE SUBPOENAS. AND INEVITABLY WHAT THEY DO IS ON THE ELEVENTH HOUR OF TRIAL, THEY

PRODUCE TO US SOMEONE WHO IS FAMILIAR WITH THE LOCAL AREA WHO IS A CUSTODIAN OF RECORDS.

THE PROBLEM THAT I HAVE IN THIS CASE -- OVER AND OVER AGAIN WE ARE GETTING CUSTODIANS WHO HAVE NOT SEEN THE SUBPOENA, AND THEY DO NOT KNOW WHAT THE BUSINESS RECORDS ARE RESPONDING TO AND WHAT THE SEARCHES WERE.  AND THE PROBLEM IS THAT WE ARE HAVING THIS HAPPEN OVER AND OVER AGAIN. (emphasis added)

THE COURT:  WELL, YOU TURNED THIS STUFF OVER, RIGHT?

MS. POTEAT:  ABSOLUTELY.

THE COURT:  AND THE DEFENSE KNEW ABOUT IT.

MS. POTEAT:  ABSOLUTELY.

THE COURT:  IT SEEMS TO ME IF YOU WANTED TO PRESENT THIS BY WAY OF DEFENSE AND YOU KNEW THAT THE GOVERNMENT WAS GOING TO RELY UPON THESE RECORDS, YOU COULD HAVE ISSUED YOUR OWN SUBPOENA AND YOU COULD HAVE HAD THEM DO A CHECK TO SEE IF YOUR CLIENT'S NAME APPEARED. (Tr. 10-17 am pp 66-67)

…

MS. POTEAT:  CAN WE ALSO JUST SAY -- BECAUSE WE'RE GOING TO HAVE OTHER CUSTODIANS OF RECORDS.  LET ME JUST SAY -- MY POSITION IS THIS.  I OBJECT IN ADVANCE TO CONTINUED CROSS-EXAMINATION OF THIS NATURE BECAUSE IT IS NOT -- **IN THE GOVERNMENT'S ESTIMATION, IT'S NOT APPROPRIATE TO ASK INAPPROPRIATE QUESTIONS AS A SUBSTITUTE FOR WHAT SHOULD HAVE BEEN A PROACTIVE DEFENSE**, AND THE GOVERNMENT – (emphasis added)  (Tr. 10-17 a.m. p 71)

…

MS. POTEAT:  OKAY.  THE PROBLEM THAT I HAVE WITH THIS, YOUR HONOR, IS THIS IS HAPPENING OVER AND OVER AGAIN WITH MR. RUDASILL.  IT HAPPENED WITH ANOTHER CUSTODIAN.  **AND AS I SAID AGAIN, IMPROPER QUESTIONING IS NO SUBSTITUTE FOR GOOD, HARD, PROACTIVE DEFENSE WORK**.  AND WHAT IS HAPPENING IS THAT THEY

ARE TRYING TO USE THE CUSTODIANS OF RECORDS REPEATEDLY -- I DON'T SAY "THEY" – (emphasis added) (Tr. 10-17 a.m. p 76)

…

THERE WAS NOT A SEARCH EVER DONE FOR MR. DOWNS. AND THE PROBLEM IS HE KEEPS HOODWINKING THE GOVERNMENT INTO THESE STIPULATIONS THROUGH THIS IMPROPER BEHAVIOR.  AND THIS IS NOT THE FIRST TIME IT HAPPENED.  THIS CASE HAS BEEN PUNCTUATED BY THAT KIND OF THING.

AND NOW WE ARE BEING FORCED TO STIPULATE TO SOMETHING --NO MATTER WHAT WE DO, HE HAS PLAYED THIS GAME WHERE HE IS INSINUATING IN THE MIND OF THE JURY SOMETHING THAT IS NOT TRUE.  AND THE PROBLEM IS I DON'T REALLY THINK -- AND WE HAVE ANOTHER THING.  IF HE STANDS UP HERE ONE MORE TIME, AFTER TELLING THE COURT YESTERDAY -- THE DAY BEFORE YESTERDAY --WE HAVE THE TRANSCRIPT WHERE HE SPECIFICALLY STATED THAT HE WAS REPRESENTING MR. HOPKINS AS WELL -- AND HE STATES THAT HE ONLY REPRESENTS MR. DOWNS -- I THINK THE COURT SHOULD STOP HIM.

THERE JUST NEEDS TO BE SOME DECORUM.  I FEEL THAT THERE NEED TO BE SOME RULES OBSERVED HERE.  AND THIS BEHAVIOR -- IT'S BEGINNING TO AFFECT WHAT IS HAPPENING IN THE CASE IN A WAY THAT IS PREJUDICING EVERYBODY -- AND I INCLUDE, WHEN I SAY THAT, MR. DOWNS .

I THOUGHT THE COURT MADE A RULING ABOUT A FEW THINGS.  WE CAN STIPULATE TO THIS, BUT I AM NOT DOING IT AGAIN, YOUR HONOR, AND I DON'T SAY THAT TO BE DIFFICULT TO THE COURT.  I HAVE UTMOST RESPECT FOR THIS COURT.  **IT'S JUST THAT THIS IS A TRICK, AND IT'S A SUBSTITUTE FOR GOOD, HARD WORK**.  IT'S INAPPROPRIATE, AND HE CONTINUES TO STAND UP AND INTRODUCE HIMSELF AS ONLY REPRESENTING MR. DOWNS.  THERE ARE ALL KINDS OF THINGS HAPPENING HERE THAT ARE SIMPLY UNACCEPTABLE.

WE WILL STIPULATE THIS TIME, BUT I WOULD ASK THE COURT TO DIRECT HIM NOT TO ASK THOSE KINDS OF QUESTIONS AGAIN UNLESS HE HAS A GOOD-FAITH BASIS -- AND I AM TELLING YOU RIGHT NOW THERE IS NOT A CUSTODIAN WHO IS THE PERSON WHO RECEIVED THE SUBPOENA ORIGINALLY.

AND IF HE WANTS TO TALK TO -- HE IS GOING TO HAVE TO HAVE THE SUBPOENA IN HAND OR HE IS GOING TO HAVE TO HAVE SOME RECORDS -- ALL THAT WAS PROVIDED, INCLUDING OUR SUBPOENA COPIES, IN THE DISCOVERY MORE THAN SIX MONTHS AGO. AND **AS I SAID, ASKING THESE KINDS OF UNDERHANDED QUESTIONS IS JUST NOT A SUBSTITUTE FOR GOOD, PROPER WORK, AND WE OBJECT**. (emphasis added)(Tr. 10-17 a.m. pp. 77-78)

The government in its reply states that.

> Mr. Down's does not claim that Mr. Rudasill's decisions to call character witnesses or present the defenses of 'mere buyer-seller relationship' was a deficient defense . Instead he claims that because the jury could not reach a verdict against two of his co-defendants, that his counsel was deficient for not achieving the same result. Downs appears to concede that the decisions made by his counsel were tactical. (GR  p 39 fn 19)

This is a complete misinterpretation of Mr. Down's motion for a new trial. It is clear that the government has disregarded Mr. Down's motion for a new trial or the conclusions reached in it.

> In conclusion, it was wrong and highly improper for Mr. Rudasill to tell Mr. Downs that a sitting United States District Court Judge would vent his animus towards Mr. Rudasill by retaliating against Mr. Downs. This deprived Mr. Downs from ever making informed decisions throughout the trial.  Mr. Rudasill erred in cross

examining government witnesses for the benefit of Mr. Hopkins and to the detriment of Mr. Downs.  Mr. Rudasill erred in putting on character witnesses and then opening the door for critical government cross examination   by asking them if Mr. Downs was involved in the drug trade.  Mr. Rudasill erred by putting Mr. Downs on the stand during the motions hearing and at trial. This crucial error caused Mr. Downs to admit to the crime on the stand in the presence of the jury.  Mr. Rudasill erred by not having the juror who felt threatened be voir dired by the Court and having that record preserved.  Had Mr. Rudasill not made these crucial errors, the outcome of this trial would have been different as evidenced by the verdicts of Mr. Bryant and Mr. Hargrove.  The government's evidence against each of them was comparable to Mr. Downs and the jury did not convict.

Mr. Rudasill's performance in this case amounted to a conflict of interest and nothing less than ineffective assistance of counsel and Mr. Downs requests a new trial. (Motion for New trial p 95)

Mr. Downs would have better served with a defense of reasonable doubt and not putting on a defense case, than what happened to him here.

**WHEREFORE**, for the foregoing and any other reasons that may appear just and proper, undersigned counsel respectfully moves this Honorable Court for the entry of an Order granting the defendant a new trial.

Respectfully submitted,

      **/s/**
Mark J. Carroll, #414-619
9520 Reach Road
Potomac, Md. 20854
Tel. No. (301) 762-6453
Fax No. (301) 762-6454
Cell No. (443) 421-3475
Markjcarroll@hotmail.com

### CERTIFICATE OF SERVICE

I hereby certify that on the 27th Day of August, 2008, a copy of the foregoing Reply Memorandum to Government's Response to Motion for New Trial was sent by email, and e-filing to:

S. Elisabeth Poteat
Assistant United States Attorney
U. S. Attorney's Office
555 Fourth Street, N. W.
Washington, D.C. 20530

Respectfully submitted,

      **/s/**
Mark J. Carroll, #414-619
9520 Reach Road
Potomac, Md. 20854
Tel. No. (301) 762-6453
Fax No. (301) 762-6454
Cell No. (443) 421-3475
Markjcarroll@hotmail.com