UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL NO. 06-227 (RBW)** |
| | : | |
| v. | : | **Judge Reggie B. Walton** |
| | : | |
| **JOHN DOWNS III,** | : | |
| Defendant. | : | |

**GOVERNMENT'S CORRECTED REPLY TO DEFENDANT'S RESPONSE TO GOVERNMENT'S OPPOSITION TO MOTION FOR NEW TRIAL**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby replies to the defendant's response to the government's opposition to defendant's motion for new trial.

I. <u>Attorney Rudasill Did Not Delegate Any Decision-Making Authority to Defendant's Sister</u>.

Attorney James Rudasill, Jr. communicated with the defendant's family as requested by the defendant. John Downs, III, specifically requested that trial tactics, motions, and case status be communicated to his sister, Dierdre Peters. In keeping with his client's wish, Attorney Rudasill communicated with the defendant's family. He did not defer to their wishes with respect to trial tactics. For example, as the government mentioned in its brief at p. 6-8, 12-14, 16, several motions were suggested by Ms. Peters that Attorney Rudasill knew were not meritorious. He did not file these briefs, as the government has previously stated. Moreover, though Ms. Peters counseled her brother to decline the plea offer, Attorney Rudasill counseled him to accept the plea offer, as the government has earlier noted, and as this Court has noted. Instead of heeding the advice of counsel, Downs placed his trust in his family, who clearly love him and wanted the best for him based on their experience. Downs did this of his own election.

Defendant's response cites model rule of professional conduct which is inapposite in this case for it was not counsel Rudasill who split his loyalty to his client, but Downs himself who failed to listen to his own lawyer.

II.   Attorney Rudasill's Efforts to Prevent the Admission of Statements was Effective.

Having discussed the risks of the defense of mere buyer-seller relationship with Downs, Attorney Rudasill called a series of character witnesses who all described Downs as a decent person not inclined to be involved with drugs. This clearly supported the notion that Downs' drug sales were intermittent and not conspiratorial in nature, consistent with the defense Downs hoped to advance successfully - mere buyer-seller. Counsel then sought to try to prevent the government from admitting certain statements to contradict the character witnesses' claims that Downs was law-abiding. Specifically, Attorney Rudasill made the only credible argument that he could for preventing the admission of the government's rebuttal evidence. That is, that the evidence did not rebut any statement made by the witnesses. The fact that his efforts to prevent admission of the statements were not successful is not proof that Attorney Rudasill was ineffective. On the contrary, Attorney Rudasill was making efforts to control any damage to his client, which is the hallmark of advocacy. Further, Attorney Rudasill is a veteran of many debriefings in United States District Court and has cross-examined many cooperators over the years. He read the debriefing letter, and he knew its contents, both from reading it to Downs, and from having seen it many times before over the years. Accordingly, Attorney Rudasill advised his client of the limitations of the letter before the initial debriefing, as did government's counsel. Attorney Rudasill's later efforts to stop damaging rebuttal are not proof that he did not read and understand the debriefing letter, but instead represent an effort by him to deal with a bad situation.

   III.   The Record Will Demonstrate that Downs Specifically Requested Joint Meetings with Hopkins' Counsel.

Attorney Rudasill's notes, taken coterminous with his various meetings with Downs at the jail, reveal that Downs communicated his desire for joint defense meetings during a visit shortly before trial began. The government has not asserted that Attorney Rudasill met with Troy Hopkins' attorney or with Hopkins and planned trial tactics. On the contrary, the evidence will show that Downs had poorly conceived notions of presenting what he apparently thought would be a unified front to the government's evidence. This approach, while helpful in battle, is generally a bad approach to defending a conspiracy. It was not until the beginning of trial, as counsel for Downs concedes by referencing the transcript that says so, that Hopkins spoke out to Attorney Rudasill from the lock-up asking for his assistance in the case.

   IV.   Banter Between Counsel in Courthouse is Not Proof in the Record of a Certain Sentence.

Remarkably Attorney Carroll continues to refer to mere banter between himself and government's counsel, straining any professional etiquette and the law. He further attempts to shore up his argument by referring to such coffee-talk as proof that Downs would have received a time-served sentence had he pleaded guilty. First, neither government's counsel has never told Attorney Carroll that they were prepared to offer any sort of the time-served sentence. Attorney Carroll misunderstands the system employed at the United States Attorney's Office in District Court cases. He certainly misunderstand any conversation he ever had with government's counsel.

Attorney Carroll also invites this Court to treat as record-matter the clearly off-the-record, retrospective musings of government's counsel. He asserts - without support - that this Court can draw a "reasonable inference" that government's counsel had "a hand on the pulse of the [Departure]

3

Committee." Indeed any inference of this type would not be reasonable at all.

It would be unreasonable to conclude that counsel's retrospective musings amount to proof about the sentence Downs would have received, if, hypothetically, he had: 1) pleaded guilty as advised, 2) provided substantial assistance, 3) convinced the departure committee that such assistance was substantial, and 4) convinced this Court to sentence him according the government's recommendation, if such a recommendation were ever made.

The written plea offer put forth in writing the exact terms of the plea, none of which even vaguely resemble what Attorney Carroll suggests they were. The government still has its copy of that letter, which follows a well-established protocol for cases in District Court. It clearly stated that Downs would be made no sentencing promises whatsoever. It reminded Downs that a United States District Court Judge makes the decision about sentencing in any criminal case, not the individual prosecutors, and not the Departure Committee of the United States Attorney's Office of the District of Columbia.

    V.    <u>The Standard for a Waiver of Conflict is Not Whether Government's Counsel is Satisfied</u>.

Without any legal authority whatsoever, Downs asserts that this Court should determine that the waiver of conflict was not complete because government's counsel expressed dissatisfaction with the waiver. This is a novel theory that finds no support in the law. Further it suggests that the standard on review of such a matter is the individual satisfaction of the prosecutor. Instead, the standard is whether the waiver was knowing as determined by a United States District Judge with wide latitude to refuse such a waiver.

Further the government has already noted in its brief that Downs admitted on the record that

Attorney Rudasill had told him in advance that he was going to ask some questions for Hopkins. Downs thereafter expressed his consent for that to happen.

    VI.    <u>Government's Counsel's Irritation At Defense Counsel Does Not Amount to Proof</u>

Hoping to forge another new legal theory, Downs also asserts that government counsel's comments during trial amount to proof that Attorney Rudasill failed to investigate airline flight records. There is no legal support for the claim that government's counsel's opinion of how a witness is handled by the defense counsel decides whether defense counsel has been effective or not.

During the relevant exchange, Attorney Rudasill was highlighting an important feature of his buyer-seller defense - that Downs had not traveled to California with Darnell Jackson except to attend the BET Award Ceremony.

Consistently Down's counsel appears to confuse the concept of the "record," by repeatedly referring to government counsel's asides as proof of fact. An attorney's complaints and expressions of exasperation under these circumstances do not prove anything whatsoever.

    VII.    <u>Downs' Response Appears to Confuse the Standard for Ineffectiveness</u>.

Downs asserts in his response that he would have been "better served" by a defense of reasonable doubt than by the mere buyer-seller defense. Further Downs also asserts that he would have been "better served" by accepting a guilty plea. This is not the standard under the law.

The standard is whether the challenged actions "*might*" be considered sound trial strategy." <u>Strickland v. Washington</u>, 466 U.S. 668 (1984); <u>Lopez-Nieves v. United States</u>, 917 F.2d 645, 648 (1st Cir. 1990). The analysis is not whether the strategy worked (or resulted in acquittal) but whether it might have been sound. Downs must also show that the errors were so serious that his "counsel was not functioning as counsel under the Sixth Amendment." <u>United States v. Holton</u>, 122 F.2d 21,

25 (D.D.C. 2000) quoting Strickland, 466 U.S. at 687. The questions of whether he would have been better served is not one that can be found in the case law.

Downs forgets that his primary objections to the government's plea offer were twofold: 1) that the government would not promise him a sentence, and; 2) that he saw himself as a mere buyer-seller to Jackson. That was his defense from the outset of plea negotiations. He never complained that the government's case lacked proof overall, though he quibbled with certain aspects of the case. In meetings between government's counsel and Downs, his repeated complaint was that he felt the drug amounts in the government's factual proffer were too high, and that he should not be held responsible for the gun enhancement. In essence his complaints were a factually specific version of the over-arching defense of mere buyer-seller relationship.[1] These plea negotiations, which spanned more than nine months, did not change in tone. In the end, the buyer-seller defense was advanced at trial.

As for Downs' rejection of the plea offer, it is clear that he took advice from someone other than his attorney. Downs had to have known, having been played the calls and the videotapes that were later admitted at trial, that the government would prove his involvement in the conspiracy. Downs must have considered the fact that the government had wiretap calls between himself and Jackson during the important time period - when the PCP was seized at Dulles Airport. Further, any rational viewing of the evidence against him would have lead him to conclude that in the calls, he and Jackson were obviously discussing that very seizure. Indeed he was so advised on numerous

---

[1] During plea negotiation, Downs repeatedly complained that the gun bump and the drugs amounts assigned to him were excessive. Attorney Rudasill stated in open court that he thought Downs should plead guilty. Downs protested at the time that he thought the government's plea offer was too high. In total contradiction of the entire history of negotiations he now claims that he was advised not to plead.

occasions by Attorney Rudasill. That Downs elected to heed another's advice is not the fault of his attorney.

Further, before trial even began, Downs asserted his desire to testify, a right he personally held under the plain language of the Sixth Amendment. Attorney Rudasill was in the untenable position of having to defend a client who had knowingly debriefed, and whose most viable defense would be unlikely to succeed unless he testified.

Downs now asserts that, in retrospect, he understands that he should have pleaded guilty, or, alternatively he argues, he should have asserted a defense of reasonable doubt. The problem with this assertion is that Downs was told it would be in his best interest to plead guilty. Further, the only defense he ever claimed was one of buyer-seller. Therefore, after he elected to go to trial, Attorney Rudasill advanced that defense on behalf of his client. Moreover, Downs elected to testify at trial, knowing the risks because he was told by his attorney. He does not say in any of his filings how he would have advanced the mere buyer-seller defense without testifying. Instead he just states that he should have relied on the defense of reasonable doubt, since that worked for other defendants who faced very different evidence at trial. The cases cited by the government discourage the view that hindsight proves ineffectiveness.

Downs' contradictory assertions and post-trial epiphany do not change what his frame of mind was at the time he rejected the plea.

VIII.   Conclusion.

WHEREFORE the defendant's motion for a new trial should be denied.

                                    Respectfully submitted,

                                    JEFFREY A. TAYLOR
                                    UNITED STATES ATTORNEY
                                    Bar. No 498-610

By:       \_\_\_\_\_/s/_____
              S. ELISA POTEAT
              EMORY V. COLE
              Assistant United States Attorneys
              Organized Crime and Narcotics Trafficking Section
              555 4th Street, N.W., Room 4106
              Washington, D.C. 20503
              (202) 514-7067
              Elisabeth.S.Poteat@usdoj.gov
              Emory.Cole@usdoj.gov

*Certificate of Service*

    I certify and an e-copy of the government's corrected reply to the defendant's motion for a new trial was sent to the attorney for the defendant, Mark Carroll, this the 2nd day of September, 2008,

_____/s/_____
S. Elisa Poteat